RAY CARLTON, Appellant, *v.* PAUL MANUEL, Doing Business Under the Firm Name and Style of "I–X–L" Laundry Company, Respondent.

No. 3494

December 10, 1947.     187 P.2d 558.

*Morgan, Brown &. Wells* and *Oscar Zapf,* all of Reno, for Appellant.

*Sidney W. Robinson,* of Reno, for Respondent.

## OPINION

By the Court, EATHER, C. J.:

The evidence in this case establishes the fact that on or about the 5th day of February 1945, appellant purchased a business in Reno, Washoe County, Nevada, consisting of a laundry route, from one Ken Darrah. The evidence further establishes the fact that at the time of purchase of said business, the laundry work and dry cleaning work of the customers of said laundry route was processed and finished by respondent doing business under the firm name and style of "I–X–L Laundry." At the time of the purchase of said business by said appellant, he and his immediate predecessor in interest were allowed a trade discount of thirty-two percent on the published public list price of laundry and dry cleaning for all such work brought to the plant of respondent. The evidence further establishes the fact that at no time was there in existence any written agreement as between respondent and appellant covering the matter of the aforesaid discount rate or any other matters pertaining to said business relationship, and further, that respondent was under no obligation to perform services for appellant, and that appellant was under no obligation to bring laundry or dry cleaning to the plant of respondent for processing. In other words, the evidence establishes the fact that each item of work done and performed by respondent for appellant constituted a separate transaction and that neither of the parties had any continuing contractual relationship of any kind with the other.

This situation prevailed until on or about the 19th day of November 1945, at which time appellant was notified by respondent that the discount rate of thirty-two 'percent previously allowed to appellant for appellant's work would be reduced to twenty-five percent. The evidence does not indicate that after said notification any other discount rate was allowed by respondent to appellant in connection with laundry or dry cleaning work performed by respondent for appellant. The parties continued to do

business with each other at said new reduced discount rate until on or about the 14th day of March 1946, at which time appellant ceased transacting business with respondent. The evidence further establishes the fact that for the period from February 5, 1945, until November 26, 1945, appellant paid to respondent the cost of all laundry and dry cleaning performed by respondent for appellant at the established list price less a discount of thirty-two percent, and that from November 26, 1945, until on or about the 4th day of March, 1946, appellant paid to respondent the cost of all laundry and dry cleaning performed by respondent for appellant at the list price thereof, less a discount of twenty-five percent, and that no payments were made by appellant to respondent for work done between the period from March 4, 1946, to and including March 14, 1946.

This action was commenced in the trial court by respondent for the purpose of recovering for the value of said laundry and dry cleaning performed by respondent for appellant for said period from March 4, 1946, until March 14, 1946, said value of said work, labor and services being computed upon the established list price for said laundry and dry cleaning less a discount of twenty-five percent, said discount being the same allowed to and paid to appellant for such work done since on or about the 26th day of November 1945. Appellant denied owing any money to respondent, and set up various affirmative defenses which give rise to this appeal.

The first of said defenses alleges in substance that the thirty-two percent discount rate was established by oral agreement on February 5, 1945, and that the same continued without change for the period of time from November 26, 1945, to April 30, 1946, and that not withstanding the fact that all bills had been settled during said period of time for the modified discount rate of twenty-five percent, that said bills should have been settled on the original discount rate of thirty-two percent, and that by reason of said fact, respondent is indebted to appellant for the difference in said discount

rate for work paid for during said period of time in the total sum of $613.93.

The second affirmative defense alleges in substance that the reduction in discount rate made by respondent on November 26, 1945, from thirty-two percent to twenty-five percent, constituted a violation of war labor board regulations in that the same amounted to a reduction in salary without the prior approval of the war labor board.

By way of counterclaim and cross-complaint, said appellant sought to recover the aforesaid sum of $613.93 representing the amount claimed to be due by appellant from respondent for work performed by respondent for appellant from November 26, 1945, to April 30, 1946, computed at the original discount rate of thirty-two percent, said work having already been paid for by respondent at the changed discount rate of twenty-five percent, with the exception of the period forming the subject matter of plaintiff's complaint, wherein no payment whatsoever was made for any work done and performed by respondent. By way of a second cross-complaint and counterclaim, appellant alleged in substance that the claimed oral agreement for a thirty-two percent discount rate existed from February 5, 1945, to April 30, 1946, and that respondent, in combination with various other laundry operators doing business in Washoe County, Nevada, unlawfully conspired for the purpose of reducing said discount rate from thirty-two percent to twenty-five percent; that said alleged conspiracy for the reduction of said discount rate was applicable not only to appellant, but to various other contract drivers owning laundry routes similar to that owned by appellant. Said counterclaim and cross-complaint alleged that said conspiracy was unlawful and in restraint of trade for the purpose of maintaining said reduced discount rate and creating a monopoly, thereby allegedly destroying appellant's freedom of contract and resulting in damages to him in the sum of $5,000.

Upon the trial of this matter, respondent established

the fact that he had performed the services referred to in his complaint for the period therein alleged; that he had received no pay therefor and that the value of the same was in the sum of $457.99, computed at the discount rate of twenty-five percent. Judgment was entered for respondent as against appellant in said amount. During the course of the trial the lower court excluded all testimony upon the question of the alleged conspiracy to reduce the discount rate herein referred to, as pleaded in appellant's second cross-complaint and counterclaim, upon the ground that said testimony was wholly irrelevant, immaterial, and incompetent. The trial court further refused to permit testimony to be introduced with reference to appellant's second affirmative defense upon the ground that no employer-employee relationship existed as between the parties, and that consequently the reduction in discount rates was not a violation of the regulations of the war labor board. The trial court held that the transactions of the parties subsequent to November 26, 1945, were governed by a discount rate of twenty-five percent, and that there was no contract existing between respondent and appellant for a thirty-two percent discount rate subsequent to said date.

Appellant has made three assignments of error; first, that the trial court was in error in excluding the evidence offered by appellant in respect to the allegations of his second cross-complaint and counterclaim (said allegations being those pertaining to the conspiracy herein referred to); second, that the trial court erred in not permitting evidence in respect to appellant's second affirmative defense to the effect that the change in discount rate was unlawful by reason of being in contravention of war labor board regulations, and third, that trial court erred in finding that any contract came into existence on the basis of a discount rate of twenty-five percent by reason of appellant's continuing to do business at said changed discount rate. We have made a full and complete examination of the record upon the

trial of this case and of the briefs filed by respective counsel, and we conclude therefrom that none of appellant's assignments of error are well taken.

■ For purposes of convenience, we will discuss the second assignment of error first, since the first and third assignments of error may properly be considered together, and form the principal basis for this appeal. We find no merit in appellant's contention that the reduction of discount rates herein referred to violates the regulations of the war labor board, by reason of the fact that the uncontradicted testimony of all parties establishes that appellant was an independent contractor owning an independent business consisting of a laundry route purchased by him on February 5, 1945, as hereinabove related. As such independent business man, appellant did not in any respect occupy an employee status insofar as respondent was concerned. Since no employer-employee relationship existed as between the parties, the regulations of the war labor board had no application, and said reduction in said discount rate was not in contravention of any such regulations. It affirmatively appears from appellant's second affirmative defense that said federal regulations therein referred to are applicable solely to an employer-employee relationship and pertain to decreases in salaries between persons occupying such relationships. Furthermore, it appears from the record that counsel for appellant recognized the inapplicability of said second affirmative defense and apparently abandoned any effort to prove the same upon the trial of this case. As a matter of fact, the record does not disclose any formal offer of proof regarding said second affirmative defense. We refer to the transcript of testimony, pages 84 and 85, wherein the following appears to have transpired:

"The Court: That offer is denied so far as it concerns the alleged conspiracy. It is granted so far as it concerns any other matter that the defendant desires to put in evidence which might constitute a defense to the action.

"In other words, Mr. Brown, I am convinced that the opinion of Judge Farrington (infra), in 159 F. (500), is the law in this state, and if you will read that decision I am convinced you will agree with me that Judge Farrington has correctly stated the law."

"Mr. Brown: Well, Judge, we have alleged two other defenses in our answer and cross-complaint. We have alleged this reduction was unlawful because of the OPA regulations which were in effect, and second, it violated the regulations of the War Labor Board, and it has been admitted by counsel in their reply that they have never submitted any reductions in commissions to the War Labor Board; but in view of the fact that the testimony in this case disclosed, and it is admitted in the reply, that Mr. Carlton was the owner of an independent laundry route, we would like to have an opportunity at the convenience of the Court, to present the OPA regulations to establish, in our opinion, the increase in price which would have affected Carlton by the decrease of commissions, which amounted to an increase in price."

"The Court: There is no increase in price attempted to be alleged here."

From the foregoing it is evident that counsel for appellant endeavored to prove matters pertaining to the OPA regulations involving price increases and entirely abandoned any effort to establish that the reduction in discount rate violated regulations of the war labor board, since he apparently recognized that such regulations did not apply to appellant as owner of an independent laundry route. A search of the record, however, discloses that no affirmative defense of any kind appears in the record pertaining to violations of the OPA regulations. Consequently we can arrive at no other conclusion than that appellant's second assignment of error should be overruled.

We will now consider appellant's first and third assignments of error relating to the exclusion of testimony pertaining to the alleged conspiracy and the finding of the trial court that the contractual relationship between

appellant and respondent subsequent to November 26, 1945, was based upon a twenty-five percent discount rate.

■■ At the outset we wish to observe that the legislature of the State of Nevada has never deemed it advisable to enact any statute governing matters pertaining to monopolies, combinations, or restraints of trade, and consequently, in arriving at a determination of this matter, we are obliged of necessity to rely solely upon the principles of the common law pertaining thereto. At common law, personal services cannot be the subject of a technical monopoly, a monopoly being predicable only on rights or interest in property. See 41 C.J., p. 172, sec. 170, wherein the following language is used, amply supported by substantial authority. "An agreement fixing the price of labor is not forbidden by the common law. Nor is labor a 'commodity' 'article of merchandise,' 'product,' or 'convenience,' 'repair,' 'any article or thing whatsoever,' or 'trade,' or 'commerce,' within the meaning of federal or state anti-trust acts, and an agreement to fix the price of labor is not forbidden by any of these statutes; and this is so whether the labor is physical or intellectual or a combination of the two. Nor is an agreement fixing and regulating the price of labor a 'trust.' The foregoing principles have been applied to agreements fixing the price of laundry work, or fixing the price for dyeing and dressing of furs. They also have been applied to agreements between physicians fixing charges for professional services, and to agreements fixing and maintaining the rates of commission and brokerage to be charged by the members of an association of dealers."

See, also, the case of Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 S.W. 997, at page 1002, 22 L.R.A.,N.S., 607, 128 Am.St. Rep. 492: "* * * and at common law personal service—an occupation—could not be the subject of a monopoly. In discussing that question, in the case of State ex rel. v. Associated Press, 159 Mo. (410), loc. cit. 456, 60 S.W. 91, 104, 51 L.R.A. 151, 81 Am.St.

Rep. 368, this court used this language: 'But there is nothing here on which a monopoly can attach. The business is one of mere personal service—an occupation. Unless there is "property" to be "affected with a public interest there is no basis laid for the fact or the charge of a monopoly." ' "

■■ The only type of combinations or monopolies or restraints of trade which fell within the ban of common law principles were those monopolies, combinations or restraints of trade which tended in any way to limit, fix, control, maintain, or regulate the price or production of any article of trade or manufacture or the use of the same. Labor was never deemed to be a commodity at common law, and combinations affecting personal services were not unlawful or the subject of actions for damages. These common law principles have been adhered to in connection with judicial construction of statutes regulating monopolies, combinations, and restraints of trade, and even under such statutes, labor or personal services have never been construed to constitute a commodity or article of trade. See the case of Rohlf v. Kasemeier, 140 Iowa 182, 118 N.W.276, 278, 23 L.R.A., N.S., 1284, 132 Am.St.Rep. 261, 17 Ann.Cas. 750, wherein the following language is used by the Iowa court: "If we were to adopt the view so strongly presented by appellant's counsel, it would be on the assumption that the associated words 'merchandise' and 'commodity' include the wages to be paid for labor, because labor is a sort of merchandise, subject to barter and sale as other goods. * * * We are constrained to hold that labor is not a commodity within the meaning of the act now in question. As supporting this conclusion, see Hunt v. Riverside Co-Operative Club, 140 Mich. 538, 104 N.W. 40 [112 Am.St.Rep. 420], 12 Detroit Leg.N. 264; Queen [Ins. Co.] v. State, 86 Tex. 250, 24 S.W. 397, 22 L.R.A. 483. It seems to be the almost universal holding that it is no crime for any number of persons without an unlawful object in view to associate themselves together, and

agree that they will not work for or deal with certain classes of men, or work under a certain price or without certain conditions. Carew v. Rutherford, 106 Mass. [1], 14, 8 Am.Rep. 287; Commonwealth v. Hunt, 4 Metc., Mass., 111, 134, 38 Am.Dec. 346; Rogers v. Evarts, Sup. 17 N.Y.S. 268; United States v. Moore, C.C., 129 F. 630. * * * it follows that the word 'commodity,' when used with reference to prices, should not be held to include labor. No case has been cited which supports appellant's contention, and we have not been able to find any."

■■ It is our opinion that in the instant case no commodity as such is involved and that consequently the conspiracy alleged in appellant's second affirmative defense does not constitute a cause of action under common law principles within the State of Nevada. The purpose of the alleged conspiracy was to maintain a reduced discount rate as between appellant and respondent in connection with personal services furnished by respondent for appellant. Such personal services are not a commodity at common law, and consequently any conspiracy with reference thereto would not violate any common law principle or give rise to a cause of action for damages in connection therewith. Laundry services have in several cases been held to constitute a matter of personal services rather than the production of a commodity, and in this connection, we expressly refer to the case of State of Arkansas ex rel. Moose v. Frank, 114 Ark. 47, 169 S.W. 333, 336, 52 L.R.A.,N.S., 1149, Ann.Cas.1916D, 983: "If the business of laundering is not a commodity, then an agreement fixing prices for the performance of that service is not within the inhibition of the anti-trust act. No other word or term in that act could include that business. The act does use the word 'repair,' but it cannot be seriously contended that this word is sufficient to embrace the business of laundering. It may be true that to some extent laundries do repair the clothes which they

wash, but it does this as a mere incident to that business; and by such service they merely 'repair' the damage which they have done in performing their service of making the clothes clean. The business of laundering is a mere service done, whether performed by hand or by machinery, and an agreement to regulate the price to be charged therefor is in its last analysis merely an agreement to fix the price of labor, or services, and the Legislature of this state has not made such an agreement unlawful."

We also refer in this connection to the case of State of Louisiana v. McClellan, 155 La. 37, 98 So. 748, 751, 31 A.L.R. 527:

"When we come, therefore, to consider the section referred to in connection with the business of laundry as shown by the statement of facts, there is left no possibility of doubt that such business is utterly and totally foreign to the 'trade and commerce' which the lawmakers had in view, and the restraint of which it was the object and purpose of the statute to prevent.

"The business of the laundry is not to lease or to sell, nor does a laundry deal in goods, wares, and merchandise, or other commodities. Nor has it anything to do with the fixing of the prices of commodities. In other words, there is absolutely nothing in connection with the business carried on by the laundry, or the method pursued in operating the laundry business, that would bring the laundry within any definition of 'trade' or 'commerce,' in the sense in which those words are used in the statute, or that would even suggest to the ordinary mind that such laundry was a concern engaged in trade and commerce. We are unable to conceive of any rule of interpretation by which the terms of the statute can be so broadened or enlarged as to bring the laundry business thereunder.

\* \* \* \* \* \*

"Our conclusion is that the laundry business operated

in the City of New Orleans, as disclosed by the evidence is not 'trade or commerce,' in the sense said words are used in sections 2 and 4 of Act 11 of the Extra Session of 1915; and that said laundry business was not included within the prohibition of said two sections of said act."

While it is true that both of the foregoing cases arose under anti-trust statutes, nevertheless, said statutes were but declaratory of common law principles, and common law principles were used in connection with interpreting the statutes involved. By an application of said common law principles, it has been determined that a laundry business is a business involving personal services rather than commodities, and consequently that no action involving monopolies, combinations, or restraints in trade, can be maintained in connection with agreements fixing the price, or tending to fix the price of such personal services. Various other cases supporting this view are to be found in an extensive annotation to the aforesaid case of State v. McClellan, supra, in 31 A.L.R. at page 533.

In connection with this phase of the matter, counsel for appellant has cited at length, and placed considerable reliance upon the case of Endicott v. Rosenthal, 216 Cal. 721, 16 P.2d 673, 676. However, we do not believe that the ruling in said case should find any application in a state governed solely by common law principles, since said case is predicated solely upon a California statute section, said section being section 1673 of the California Civil Code. It is admitted by the supreme court of the State of California that said section is much broader in its terms than was the statute under consideration in the foregoing case of State v. McClellan, in that the California statute referred not only to trade, but also to businesses of any kind. Under said California statute, the supreme court of California held that: "It could not logically be maintained that persons engaged in the industry of cleaners and dyers of wearing apparel were not engaged in some kind of business."

It will be seen that said California statute referring to

"businesses of any kind" enacted a measure much broader than any interpretation of what constitutes "trade" or "commodity" at common law. We do not believe that said Cailfornia case, under the circumstances, should be construed to override the generally prevailing common law principles applicable to this case as hereinabove enunciated.

Upon the trial of this matter, the lower court specifically referred to and relied upon the case of Goldfield Consolidated Mines Company v. Goldfield Miners' Union No. 220, C.C., decided by the late Judge Farrington, in 159 F. 500, 517. Said case involved an agreement and combination among various mine operators within the State of Nevada, which had for its purpose the following five objectives, namely: "First, to reduce the wages of the men employed by the various members of the association; second, to resume operations, giving preference to old employees; third, to reduce the cost of living in Goldfield District 20 percent; fourth, to have no further dealings with the Goldfield Miners' Union, or any organization affiliating with the Western Federation of Miners; fifth, to require each person presenting himself to any member of the association for employment to sign, as a condition of such employment, an agreement that he is not, and during the period of his employment will not become, a member of respondent union. The fifth item may be regarded as the means agreed upon to accomplish the first and fourth."

It will be observed that the purposes of the aforesaid combination were much broader in their scope than were the purposes of the conspiracy alleged in appellant's second cross-complaint and counter-claim. In referring to such combination, Judge Farrington stated as follows: "An unlawful conspiracy is a combination between two or more persons to do * * * lawful act by criminal or unlawful means. 8 Cyc. 620," and further held with reference to the foregoing quoted purposes of said combination, that: "None of the proposed acts are either unlawful or criminal. For these reasons I must hold that

complainant in entering into the agreement with the other members of the Goldfield Mine Operators' Association, which is embodied in the resolutions of December 7, 1907, was not guilty of any unlawful conspiracy against the respondents."

In said decision the following language is also used:

"It is a constitutional right of an employer to refuse to have business relations with any person or with any labor organization, and it is immaterial what his reasons are, whether good or bad, well or ill founded, or entirely trivial and whimsical.

\*　　\*　　\*　　\*　　\*　　\*

"The right of an employer to refuse to employ any particular individual, or any class of individuals, is neither greater nor less than the right of a man to refuse to work for any particular individual, or class of individuals. The reason for the refusal can in no wise control, enlarge, or diminish the legal right of refusal, the right to employ, or the right to refuse to be employed.

" 'It is a part of every man's civil right that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts.' 2 Cooley on Torts, p. 587." (Cooley on Torts, Second Edition, sec. 278, p. 328.)

The foregoing case was not decided by this court but rather by the federal circuit court for the district of Nevada. However, since said decision arose within the state, the rule set forth therein is persuasive of what the common law is within this state. Furthermore, this court has quoted said decision with approval in the case of Branson v. I. W. W., 30 Nev. 270, at page 295, 95 P. 354.

It is our conclusion, therefore, that in view of the testimony of appellant himself to the effect that he

had no continuing contract with respondent, and that his contractual relationship with respondent was of a very nebulous character, and could be terminated at the whim of either appellant or respondent, respondent committed no wrong in entering into the combination alleged to have been entered into by him in appellant's second cross complaint and counterclaim. If the testimony had indicated that a contractual relationship existed between appellant and respondent which continued for a specified term, and if said testimony had indicated that a combination or conspiracy was entered into for the purpose of destroying said contractual right, appellant's offered testimony with reference to the existence of a conspiracy might have been material. However, at the time the testimony relating to the conspiracy was offered in evidence by appellant, appellant's own testimony negatived the existence of any such contract, and to the contrary established the fact that no such contract existed. We conclude, therefore, that the trial court did not err in excluding such testimony, in view of the fact that respondent, in reducing the established discount rate to appellant from thirty-two percent to twenty-five percent, did nothing more than he had an absolute right to do. Since respondent had the absolute right to reduce said discount rate and since the services performed by respondent for appellant were, at common law, not the subject of monopolies, combinations or restraints of trade, as hereinabove found to be the case, the combination or conspiracy complained of by appellant was not a combination or conspiracy to do a wrongful act or an act in contravention of common law principles. Since respondent had the right to reduce said discount rate, the fact that he may have conspired to reduce the same with various other laundry operators, was an immaterial matter when judged by the principles of common law applicable to this case, and consequently, any testimony in support of such conspiracy would have been immaterial to a determination of the rights of the parties.

See, in this connection, the case of Bohn Manufacturing Company v. Hollis, 54 Minn. 223, 55 N.W. 1119, 1121, 21 L.R.A. 337, 40 Am.St.Rep. 319: "What one man may lawfully do singly, two or more may lawfully agree to do jointly. The number who unite to do the act cannot change its character from lawful to unlawful. The gist of a private action for the wrongful act of many is not the combination or conspiracy, but the damage done or threatened to the plaintiff by the acts of the defendants. If the act be unlawful, the combination of many to commit it may aggravate the injury, but cannot change the character of the act. In a few cases there may be some loose remarks apparently to the contrary, but they evidently have their origin in a confused and inaccurate idea of the law of criminal conspiracy, and in failing to distinguish between an unlawful act and a criminal one. It can never be a crime to combine to commit a lawful act, but it may be a crime for several to conspire to commit an unlawful act, which if done by one individual alone, although unlawful, would not be criminal. Hence, the fact that the defendants associated themselves together to do the act complained of is wholly immaterial in this case. We have referred to this for the reason that counsel has laid great stress upon the fact of the combination of a large number of persons, as if that, of itself, rendered their conduct actionable. Bowen v. Matheson, 14 Allen 499; Steamship Co. v. McGregor, 23 Q. B. Div. 598 (1892) App.Cas. 25; Parker v. Huntington, 2 Gray 124; Wellington v. Small, 3 Cush. 145 [50 Am.Dec. 719]; Payne v. [Western & Atlantic] Railway Co., 81 Tenn., 507 [48 Am.Rep. 666]."

See, also, the case of Werth v. Fire Companies' Adjustment Bureau, 160 Va. 845, 171 S.E. 255, at page 258:

"'A conspiracy consists of an unlawful combination of two or more persons to do that which is contrary to law, or to do that which is wrongful and harmful towards another person. It may be punished criminally by

indictment, or civilly by an action on the case in the nature of conspiracy if damage has been occasioned to the person against whom it is directed. It may also consist of an unlawful combination to carry out an object not in itself unlawful by unlawful means. The essential elements, whether of a criminal or actionable conspiracy, are, in my opinion, the same, though to sustain an action special damage must be proved.'

"The above was said by Lord Brampton in the case of Quinn v. Leathem, (1901) A.C. 495, 70 L.J.P.C. 76, 65 J.P. 708, 50 W. R. 139, 85 L.T.N.S. 289, 17 Times L.Rep. 749, 1 British Rul.Cas. 197. See also, 5 R.C.L. 1091, sec. 41; Amer. & Eng. Ency. of Law (2d ed.) 832; Harris v. Com., 113 Va. 746, 73 S.E. 561, 38 L.R.A.,N.S., 458, Ann. Cas.1913E, 597.

" 'The mere operation of a lawful business by lawful means, as a combination between corporations or individuals to draw to themselves business from other competitors, however hurtful to the latter, is not a conspiracy which is actionable.' 5 R.C.L. 1095, sec. 44.

"In the case of West Virginia etc. Co. v. Standard Oil Co., 50 W.Va. 611, 40 S.E. 591, 594, 56 L.R.A. 804, 88 Am.St.Rep. 895, it was said: 'Counsel for plaintiff put emphasis on the charge of conspiracy and malice; but there can be no conspiracy to do a legitimate act—an act which the law allows—nor malice therein. To give action there must not only be conspiracy, but conspiracy to do a wrongful act. If the act is lawful, no matter how many unite to do it. Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N.W. 1119, 21 L.R.A. 337, 40 Am.St.Rep. 319. * * *

" ' "It is no crime for any number of persons, without any unlawful object in view, to associate and agree that they will not work for or deal with certain men, or classes of men, or work under a certain price, or without certain conditions." Carew v. Rutherford, 106 Mass. 1, 14, 8 Am.Rep. 287.'

" 'The definition or description which seems to be more

generally adopted is that a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.' Harris v. Com., 113 Va. 746, 73 S.E. 561, 562, 38 L.R.A.,N.S., 458, Ann. Cas.1913E, 597, and cases there cited."

This principle of law finds approval in numerous authorities, and it is sufficient of our purpose to cite but one further in support thereof, namely, the case of Lindsay & Co. v. Montana Federation of Labor, 37 Mont. 264, 96 P. 127, at page 130, 18 L.R.A.,N.S., 707, 127 Am.St. Rep. 722: "But there can be found running through our legal literature many remarkable statements that an act perfectly lawful when done by one person becomes by some sort of legerdemain criminal when done by two or more persons acting in concert, and this upon the theory that the concerted action amounts to a conspiracy. But with this doctrine we do not agree. If an individual is clothed with a right when acting alone, he does not lose such right merely by acting with others, each of whom is clothed with the same right. If the act done is lawful, the combination of several persons to commit it does not render it unlawful. In other words, the mere combination of action is not an element which gives character to the act."

We conclude, therefore, that appellant's first assignment of error is not well taken and that the trial court properly excluded testimony relative to the matter of conspiracy in view of the fact that we are dealing solely with the common law principles hereinabove propounded.

With reference to the question of whether or not the parties to this action were dealing with each other on a twenty-five percent or thirty-two percent discount rate subsequent to November 26, 1945, it is sufficient to state that there is ample evidence in the record to justify the trial court in finding that the twenty-five percent discount rate prevailed between the parties after November

26, 1945. All of the dealings between the parties subsequent to said date were had upon said basis and all bills for services performed by respondent for appellant were settled upon said basis. None of the testimony offered by appellant and excluded by the trial court upon the objection of respondent would in any way have altered the testimony with reference to said matter, and consequently we are of the opinion that the trial court properly found that the relationship of the parties subsequent to November 26, 1945, was governed by the twenty-five percent discount rate.

The judgment and decision of the trial court is therefore affirmed.

HORSEY, J., concurring:

I concur in the opinion of Mr. Chief Justice EATHER, but not without reluctance.

I am opposed to, and detest, monopoly, and, in my view, the concerted action of the laundry owners of the city of Reno in organizing the Washoe County Laundry Association, evidently for the purpose of reducing the discount allowed the laundry drivers, from 32 percent to 25 percent upon the gross business turned in by them from the operation of their laundry routes, thereby reducing the compensation of such drivers more than 20 percent, and without prior collective bargaining, was unduly oppressive and arbitrary. The collective action of the members of the association, in the letter they dispatched to the laundry drivers, including the appellant, on November 19, 1945, notifying them of such reduction to become effective November 26, 1945, appears to me to have been a bold and brazen manifestation of the power and spirit of the monopolistic combination which had been formed and which destroyed, as to the business theretofore transacted upon an individual basis with the laundry drivers, all competition. The association evidently included practically all of the laundry businesses in the city of Reno. The letter

amounted to an ultimatum. The effect of it was that the drivers, who had their established laundry routes and their savings invested therein, were told, in effect, to pay the increased charge for the laundry, or go out of business in Reno, as there was no laundry, or laundries, of any consequence in the city which were nonmembers of the association, with whom the drivers could deal on a competitive basis.

We are completely powerless, however, to make these views effective, for the reason that there is no statute in the State of Nevada prohibiting monopolies or agreements in restraint of trade.

In the absence of statute, our only recourse is to the common law, and the common law exempts from the prohibition of monopolistic combinations or agreements in restraint of trade, those relating to personal services. And all the authorities classify the laundry business, or those operating same, as being engaged in merely the rendition of personal services. In addition to the cases cited by Chief Justice EATHER, I cite: Morris V. Colman, 18 Vesey Jr.'s Reports, p. 436, and State ex rel. Star Publishing Co. v. Associated Press, 159 Mo. 410, 456, 60 S.W. 91, 104, 51 L.R.A. 151, 81 Am.St.Rep. 368.

The opinion and decision of the California supreme court in the case of Endicott v. Rosenthal, 216 Cal. 721, 16 P.2d 673, related to a dyers' and cleaners' association, not different in principle, as to whether or not it related exclusively to personal services, from the laundry business. The court was able, upon the basis of section 1673 of the California Civil Code, which by its terms applied to "business" of any kind, to hold such association unlawful. Nevada not having any statute prohibiting monopolies or agreements in unreasonable restraint of trade, we are powerless, because of the absence of any legal basis, to so hold in the instant case.

It would seem that the subject of the prohibition or regulation of monopolies and trusts is one which should commend itself to the legislative branch of our state government, for appropriate consideration and action.