HOTEL RIVIERA, INC., A NEVADA CORPORATION; MUSICIANS' PROTECTIVE UNION, LOCAL No. 369, A. F. OF M. OF LAS VEGAS, NEVADA; LEWIS ELIAS, APPELLANTS, v. BENNY SHORT, RESPONDENT.

No. 4734

November 24, 1964      396 P.2d 855

[Rehearing denied December 11, 1964]

*Woodburn, Forman, Wedge, Blakey, Folsom and Hug,* of Reno, and *Foley Brothers,* of Las Vegas, for Appellant Hotel Riviera, Inc.

*Lester H. Berkson, Harold A. Slane, Sr.* and *Louis Hersh,* of Las Vegas, for Appellant Musicians' Protective Union.

*Brown & Matteucci,* of Las Vegas, for Appellant Lewis Elias.

*Morton Galane,* of Las Vegas, for Respondent.

# OPINION

By the Court, BADT, C. J.:

This case is before us for the second time. Heretofore we reversed the lower court, which had entered summary judgment for the defendants, because we felt that there was some evidence that defendants were guilty of a conspiracy, and that accordingly the case should have gone to the jury. Short v. Hotel Riviera, Inc., 79 Nev. 94, 378 P.2d 979. After remittitur a trial took place and the jury brought in its verdict for Short, awarding him $9,600 compensatory damages against all the defendants. In addition thereto, it awarded $25,000 punitive damages against the Riviera and $25,000 against the Union. The trial court denied a new trial but ordered a remittitur of $15,000 to the Riviera and $15,000 to the Union. Each of the defendants has appealed from the judgment.

For the facts of the case, see the opinion in Short v. Hotel Riviera, Inc., supra. We have examined the transcript and are satisfied that the same facts were proved by Short in the trial as were proved in the first case resulting in the summary judgment, besides certain other facts hereinafter mentioned.

1. As noted, the case was tried in the Eighth Judicial District Court, in and for Clark County. It was assigned by Honorable John Mowbray of that court to Honorable Taylor H. Wines, of the Fourth Judicial District, for trial. A statutory affidavit of prejudice was filed by Riviera against Judge Wines. It was later stricken on motion and appellant Riviera assigns this as error. The record discloses that on June 9, 1963, the parties appeared before Judge Mowbray to arrive at a trial setting. Mr. John Foley, of Foley Brothers, of Las Vegas, indicated that both he and Mr. William K. Woodburn, of Woodburn, Forman, Wedge, Blakey, Folsom and Hug,

of Reno, would actively engage in the trial in behalf of Riviera. Mr. Foley was present in court but no one from the Woodburn firm. "By the Court: Well, why don't you attempt to contact Mr. Woodburn, if you can, and I will set this matter down for 4:00 o'clock this afternoon and, in the meantime, I will call Judge Wines and see if he can hear it on September 30th.

"By Mr. Foley: * * * I feel that if we could ascertain any possibility of Judge Wines' disposition or perhaps into October some time, and where we would be available in October rather than just one date, we could get several dates from Judge Wines because I think we have to do a lot of jockeying to get a trial of that kind on the calendar, everybody has to meet other trial commitments.

"By the Court: Well, we will continue this matter until the hour of 4:00 o'clock this afternoon and at that time we will set it down for a firm setting."

In the afternoon session the following appears:

"By the Court: Gentlemen, I have telephoned Judge Wines in Elko. He was on the bench and he returned the call to me when he was able to do so. He has the week of September 30th or October 21 open. He can come either time.

"By Mr. Foley: Your Honor, I would respectfully request the October 21st date.

"By the Court: It will be the order of the Court that the case be set down for trial before a jury, Honorable Taylor Wines presiding, at the hour of ten o'clock A.M., Monday, October 21, 1963. That will be the final order."

NRS 1.230 provides for the disqualification of a judge upon the filing of an affidavit of prejudice, in which case the judge shall proceed no further in the action, but transfer the same to another judge as more particularly provided. The affidavit of prejudice must be filed before the hearing on any contested matter in the action has commenced, and in any event at least 10 days before the date set for the trial of the action and shall be accompanied by the attorneys' certificate of good faith and by the payment to the clerk of the court of $25 which shall

be placed to the credit of the district judges' travelling fund. The statute omits the former provision that "[i]f the parties agree upon a judge, then such judge shall be selected." Even with the elimination of such provision, we see no escape from the fact that an attorney may lose his right to file the statutory affidavit of prejudice (by not filing it in time or by failing to attach the required certificate of good faith or by failing to pay the required $25 fee), or may waive his right to file such affidavit (by agreeing to try the case before the judge called in by the disqualified judge). From the proceedings as above quoted, we are satisfied that counsel waived the right to file the *statutory affidavit*.[1] It is clear that the parties agreed upon Judge Wines to try the case. This fact clearly distinguishes this case from those relied upon by appellant Riviera, namely, State ex rel. Beach v. Fifth Judicial District Court, 53 Nev. 444, 5 P.2d 535; State ex rel. Stokes v. Second Judicial District Court, 55 Nev. 115, 27 P.2d 534; State ex rel. Warren v. Sixth Judicial District Court, 57 Nev. 214, 61 P.2d 6; State ex rel. Kline v. Eighth Judicial District Court, 70 Nev. 172, 264 P.2d 396; State ex rel. Moore v. Fourth Judicial District Court, 77 Nev. 357, 364 P.2d 1073. Nor is the very apparent waiver influenced by the decisions of this court in Melahn v. Melahn, 78 Nev. 162, 370 P.2d 213, or Afriat v. Afriat, 61 Nev. 321, 117 P.2d 83, 119 P.2d 883. The order striking the affidavit of prejudice, following the waiver implicit in agreement of counsel that Judge Wines might try the case, was proper. There is no merit to this assignment.

2. Error is assigned in the court's denial of a motion to strike certain testimony as hearsay. Bronson was stage manager and his duties were to handle the running of the stage, see that the acts got in on time, the show

[1]It is unnecessary for us to consider the possibility that after thus waiving the right to file the statutory affidavit (under which one peremptory challenge of the judge is permissible without stating facts constituting actual prejudice or bias), the attorney may subsequently discover that the selected judge has actually expressed prejudice against or a bias in favor of one of the parties, in which case he might seek to disqualify the judge for actual prejudice or bias.

was there, and was presented properly. Short was asked to state a conversation with Bronson. Short answered:

"I said 'Milt, Benny Short calling. Could you tell me why I received the notice from the Riviera Hotel?' He said, 'I don't know. I think Mr. Goffstein or Atol wanted to make a change.' I said 'Well, Milt, can you tell me was it musical or personal?' Mr. Bronson said 'I don't know,' he said, 'I guess it was musical.' I said, 'Well, who are you going to get, Torris Brand?' Mr. Bronson said 'No, they are just going to get another leader.' I said, 'Where you going to get the musicians from?' He said, 'We are going to use your guys.' I said, 'You can't do that, Milt,' I said, 'It is my band.' He said, 'Well, don't argue with me,' he said, 'Benny, the union said it was okay.' "

No objection was made. However, on cross-examination, counsel for Riviera exhibited to Short the list of officers of Hotel Riviera and asked Short if Bronson's name appeared thereon. Short replied that he was not listed. Thereupon the motion was made to strike the testimony "on the grounds and for the reason that it is objectionable for there is no showing of the authority of Mr. Bronson to make any statement that is binding on the party defendant hotel."

The learned trial judge was justified in denying the motion. Counsel for the hotel did not have to wait till cross-examination to determine that Bronson was not a corporate officer. He had the list of officers in his hand. He was the attorney for the hotel and was entirely familiar with the fact that Bronson was not a corporate officer. Even if he were not an officer, he was an employee whose duties familiarized him with situations involving the employment of the relief orchestra and the leader of the relief orchestra. He was familiar with the facts that he stated to Short. The only statement that was hearsay was his statement that "the union said it was okay." That statement was patently hearsay on its face and did not have to wait for cross-examination to establish that fact. The failure to object or to move at once to strike that statement was a waiver of objection.

Barra v. Dumais, 76 Nev. 409, 414, 356 P.2d 124, 126, and cases therein cited. We find no merit in this assignment of error.

Although under Riviera's contract with Short the hotel had a right to terminate the employment at any time on a specified notice, Riviera attempted to show as the reason for its cancellation of Short's contract (which cancellation resulted in the employment of Elias as the leader of Short's relief orchestra upon the resignation of all members of the orchestra from Short's employment and their accepting employment under Elias, with the Union's approval) that Riviera sought to make it appear that the dismissal of Short was the result of complaints by the artists appearing on Riviera's programs. When asked to name the artists who had complained, the Riviera named Belafonte and Marlene Dietrich, but Belafonte and Dietrich's secretary absolutely disclaimed any complaint against Short or that they had anything to do with Short. The jury had a right to infer that Riviera's claim that its artists had complained about Short was a fictitious charge, without substantiation.

3. Prejudicial error and misconduct are assigned in the argument of respondent's counsel to the jury. Although no objection was made and counsel was not interrupted during the entire course of his argument by any assertion that such argument was misconduct and no appeal was made to the court for an instruction to the jury to disregard any statements made by counsel, appellants in support of this assignment devoted page after page after page of their briefs to going through the entire argument with a fine-toothed comb and picking out every sentence that they think was unjustified or misleading or appealing to the passions and prejudices of the jury. We have carefully considered each such assignment of misconduct with care, and do not find that any of such statements constitutes misconduct. Appellants maintain that counsel in his argument personally vouched for the truth of Short's testimony. This would under the authorities have indeed

constituted misconduct, but we do not so read his argument. In our opinion what he was saying was that the circumstances supported his claim that Short was speaking the truth and that the officers of the hotel and the Union and Elias were not. This was justifiable argument. Appellants also complain that he constantly referred to the power exerted by the Union and the Riviera Hotel without any evidence to support such argument. We are of the opinion that evidence was unnecessary to support an argument of this kind. We think that every one in the community, including the members of the jury, were cognizant of such power. They assign as misconduct such statements as the claim that the defendants had "ganged up" on Short and that Short was "pushed out." This was a simple clarification of his claim that the defendants were guilty of a conspiracy. In our opinion it was justifiable argument. These assignments of misconduct are aimed at many other portions of counsel's argument, and while the argument was accusative and aggressive in the extreme, we find nothing in it to justify the charge of misconduct, especially in the absence of objection. We find no merit in this assignment.

4. Appellants assign error in the giving of nine instructions to the jury and in refusing certain instructions submitted by appellants. The record does not show objections to any instructions given or refused, and so were waived. Rule 51 NRCP: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

5. Error is asserted in the admission of expert testimony as to the factors that lead to a strip hotel's retaining an orchestra leader in its employment. We need not pass upon this assignment. If this was error, it was not prejudicial. The amount awarded by the jury of compensatory damages was $9,680, and the union scale for a relief orchestra leader was $67 for one performance per week. The jury's award apparently covered

the time between the Riviera's termination of Short's contract (March 24, 1961) and the date of the jury's verdict (November 1, 1963). This figures approximately 138 weeks, which at $67 per week brings the total over $9,000, and within a few hundred dollars of the award of compensatory damages. It does not appear that the jury based any part of its award on the expert testimony to the effect that Short could ordinarily look to employment for a period of five years.

Objections of appellants to evidence offered by respondent on the ground that it was too remote in point of time were overruled by the court. This was largely a matter of the court's discretion. We see no error.

Nor do we see any error in the court's admission of certain newspaper and magazine articles and radio broadcasts offered for the limited purpose of showing the publicity given to the plaintiff.

6. The point most earnestly argued by appellants is that the rule of law adopted in Short v. Riviera, Inc., 79 Nev. 94, 378 P.2d 979, in which we overruled a summary judgment in favor of defendants and remanded the case for trial was bad and should be overruled.

In our opinion in that case we cited the language of the United States Supreme Court as follows:

" 'An act lawful when done by one may become wrongful when done by many acting in concert, taking on the form of a conspiracy which may be prohibited if the result be hurtful to the public or to the individual against whom the concerted action is directed.' * * * [citing cases]

" 'It is settled that "an act lawful in an individual may be the subject of civil conspiracy when done in concert, provided it is done with a direct intention to injure another, or when, although done to benefit the conspirators, its natural and necessary consequence is the prejudice of the public or the oppression of individuals." ' "

At page 106 id. we recited further:

"When an act done by an individual is not actionable

because justified by his rights, though harmful to another, such act becomes actionable when done in pursuance of combination of persons actuated by malicious motives and not having same justification as the individual."

This was followed by citation of a large group of cases, and was followed by the statement:

"Many other cases could be cited. The great weight of authority is in support of the rule last discussed and we accept the same as the correct one."

Appellants have analyzed the cases thus cited in the former opinion, and contend that every one of said cases was a boycott case. Appellants contend, then, that not a single citation in support of the rule recited refers to any situation other than a boycott case, and that the rule recited in the first opinion is not supported by any case other than a boycott case, and that the former opinion creates an unwarranted extension of the boycott rule.

Respondent's answer to this argument is that the facts in this case justify analogous reasoning from the boycott cases, and thereby justify an extension of the rule in the boycott cases to the present case.

Indeed, the rule of the boycott cases has been extended to other situations. In Clark v. Sloan, 169 Okl. 347, 37 P.2d 263, the Supreme Court of Oklahoma referred to the rule as stated in 5 R.C.L. 1092 to the effect that "what one may lawfully do singly, two or more may lawfully agree to do jointly; the number who unite to do the act cannot change its character from lawful to unlawful," but continued: "A more reasonable view of the matter, however, is that while ordinarily that is the case, yet where the act done by the individual is not actionable because justified by his rights, though harmful to another, the act becomes actionable when done in pursuance of a combination of persons actuated by malicious motives and not having the same justification as the individual." The syllabus by the court recited in part: "Where parties in pursuance of a conspiracy or combination for that purpose fraudulently make use of legal

proceeding to injure another, an action lies against them at the suit of the injured person to recover damages sustained. * * *" (citing 12 C.J. 588).

In Clark v. Sloan, supra, the plaintiff had surrendered a grazing lease upon government land upon the agreement by one of the defendants to convey to him certain parcels of land. Upon receiving the surrender of the lease, the defendant refused to convey, but conveyed his own land to other members of his family. The court said: "* * * the record does indicate that Robert H. Clark, by reason of the scheme and general conduct of his business relating to the tracts of land in question, perpetrated an injury or wrong upon the plaintiff. *The jury so found by its verdict.*" (Emphasis supplied.)

The sentence last emphasized lends much to what the jury did in the present case. It gains further importance when we consider that the trial judge denied a new trial (upon remittitur of three fifths of the punitive damages—$15,000 of the $25,000 awarded to appellant Riviera and the same amount awarded to appellant Union). The learned trial judge, as well as the jury, had seen and heard the witnesses, and apparently drew the inference, as did the jury, that Short had been rather shabbily treated.

Clark v. Sloan, supra, as well as the Ruling Case Law and Corpus Juris texts therein referred to, were cited in our first opinion.

Appellants also rely on Days v. Florida East Coast Railway Company, 165 So.2d 434 (Fla. 1964), an action by discharged railroad employees against the railway company and its director of personnel who allegedly had feloniously conspired to deprive plaintiffs of their rights under agreement with their labor union. The main holding of the case, as we read it, is: "If the defendant, railroad, breached its contract to employ the plaintiffs, this breach of contract may not be converted into a tort by an allegation that it was maliciously done." Here the malice charged is not only against the employer, Riviera, but against plaintiff's Union and against Elias, all acting in concert, to the end that Elias, with Short's relief

orchestra, might serve the requirements of the Riviera. Under the authorities herein cited and cited in our former opinion, this brings all of the defendants within the rule for actionable conspiracy and for the damages resulting therefrom.

Appellants also rely on Bliss v. Southern Pacific Company, 212 Or. 634, 321 P.2d 324. It is true that this case held that Southern Pacific was not liable to a charge that it had maliciously canceled Bliss' lease in conspiracy with Trask Lumber Company, to which Southern Pacific gave a new lease, because under the terms of the original lease Southern Pacific had an absolute and unqualified right to cancel it at any time on 30 days' notice. The conspiracy alleged in the complaint was that Trask Lumber Company had willfully, falsely, wickedly, fraudulently, and maliciously represented to Southern Pacific that plaintiff had violated the terms of his lease, but it appeared from the pleading that Southern Pacific Company placed no reliance on the representations made by Trask, and, said the court, "This being so, the acts of the Trask Lumber Company were not the proximate cause of such damage as plaintiff claims to have sustained. We find nothing in the record before us to warrant holding that plaintiff has sufficiently pleaded any right of action against the defendant Trask Lumber Company." Even if we assume that the case supports the rule which we rejected in our first opinion, we do not think it in point. Here the Union permitted Elias to pirate Short's orchestra, and the Riviera (on the asserted but false ground that its star performers had complained of Short's performance) employed conductor Elias (who had previously stated that he was going to resign from his official position with the Union because he had a chance to enter the relief orchestra field), utilizing Short's musicians. These are facts which the jury was entitled to, and apparently did, believe.

The Oregon court in Bliss, citing authorities, recognized the following rule: "The law not only prohibits an unjustifiable interference by a third party with contract rights of any party to an agreement, but also prohibits the malicious interference with their prospective rights."

Riviera, after signing and dating its termination notice to Short, withheld the letter for a number of days until, following a meeting of Short's orchestra members with Elias, Riviera had been advised that Short's musicians would go with Elias with the approval of the Union. The facts in the Bliss case fall far short of the facts in the instant case.

Respondent further contends "that the prior ruling was not so 'clearly and palpably erroneous' and the alleged error was not 'so unjust' as to justify this court to reverse the ruling in that decision." In support of the latter contention he cites Nevada-California Transp. Co. v. Public Service Comm'n, 60 Nev. 310, 103 P.2d 43, 108 P.2d 850, 852, and also refers to Stocks v. Stocks, 64 Nev. 431, 183 P.2d 617, 620, and Jensen v. Reno Central Trades and Labor Council, 68 Nev. 269, 229 P.2d 908, 914. In the last-named case MERRILL, Justice, speaking for the unanimous court, which was confronted with the question whether the decision in a former case should be upheld, weighs the proposition of possible error in the former case as balanced against the doctrine of stare decisis, and concludes:

"Under the circumstances, these considerations overwhelm any fear we may hold of earlier error or its consequences. The balance falls in favor of stare decisis. The decision in the White Cross Drug case will not here be reconsidered and remains controlling in this matter."

This weight falls even more heavily in the present case, for our ruling in the previous case (Short v. Hotel Riviera, Inc., 79 Nev. 94, 378 P.2d 979) became the law of this case. When the case was tried on the remand, counsel for the plaintiff quite obviously tried his case on the strength of our former opinion, and the trial court's instructions to the jury clearly show that they were made in view of that opinion.

We may note, too, not only that the rule of the "boycott cases" has already been extended to other situations (Clark v. Sloan, supra, and see also Wise v. Southern Pacific Company, 35 Cal.Rptr. 652), but that it is significant that the rule expressed "where the act done by the individual is not actionable because justified by

his rights, though harmful to another, the act becomes actionable when done in pursuance of a combination of persons actuated by malicious motives and not having the same justification as an individual" was not in any of the cases, where the rule is so cited, restricted to boycott cases.

When we view the point raised in connection with the facts in this case, and in the light of the jury's verdict and the court's denial of the motion for new trial (except in his remittitur of three fifths of the punitive damages assessed by the jury), and in the light of our conclusion that there was ample evidence from which the jury could have drawn the inference, and obviously did, that the three defendants had conspired to the end that Elias might "pirate" Short's relief orchestra, and that Short was damaged thereby, we must reject this assignment of error.

7.  Appellants contend that the record contains no basis for compensatory damage and hence no basis for punitive damage. As to compensatory damage, we refer to what has been said above concerning Short's loss of compensation for services to the Riviera for the period commencing with the date of his discharge, up to the time of the jury verdict, a period of 138 weeks with the loss of $67 per week. We refer again to the facts stated herein and stated in our former opinion, and to our conclusion that the jury was at liberty to draw inferences from these facts to the effect that Short had suffered this loss as a result of the conspiracy of the three defendants.

8.  Appellants also contend that it was error to assess punitive damages without a showing of the financial worth of the defendants against whom they were assessed. Such is not the holding in Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824, upon which appellants rely. For this assignment appellants rely upon Dunaway v. Troutt, 232 Ark. 615, 339 S.W.2d 613. Dunaway v. Troutt

was a libel case, and plaintiff introduced evidence as to the financial standing of only one of three defendants. The Arkansas court held to the rule (which it called the majority rule) adopted in Washington Gas-Light Co. v. Lansden, 172 U.S. 534, 19 S.Ct. 296, 303, 43 L.Ed. 543, as follows: " 'While all defendants joined are liable for compensatory damages, there is no justice in allowing the recovery of punitive damages, in an action against several defendants, *based upon evidence of the wealth and ability to pay such damages on the part of one of the defendants only.*' " The Arkansas court also quoted with approval MaAllister v. Kimberly-Clark Co., 169 Wis. 473, 173 N.W. 216, as follows: " '* * * but when, for the purpose of enhancing what may be given by the jury for punitory damages, evidence is offered *as to the financial ability of the one,* it cannot but affect the amount of punitory damages to be recovered against the others, for these also must be assessed against all or none.' " (Emphasis supplied.) The minority view is also discussed to the effect that under the majority view a wealthy defendant, who is principally implicated in a wrong of this character, might escape the payment of just and reasonable damages, by having others, without character or property, associated in the unlawful act. The only holding necessary to the determination of Dunaway, on the point involved, was that underscored by us. As to the further statement in the majority opinion that the right to recover punitive damages is waived when two or more parties are made defendants in a case where punitive damages may be assessable, such holding (as noted in the concurring opinion) was not necessary, as, under numerous authorities cited, separate judgments may in the same case be rendered against separate defendants; and while such judgments for punitive damages may be prosecuted in separate suits against separate persons, a multiplicity of suits would be avoided by trying them all in one action. This does seem more logical. Annot., 63 A.L.R. 1405.

In Hanley v. Lund (1963), 218 Cal.App.2d 633, 32 Cal.Rptr. 733, 740, the court said: "Finally, defendant

argues that plaintiff was required to show defendant's wealth in seeking exemplary damages. However, defendant has cited no authority, and our research has uncovered none, directly in support of this position. The one case strongly relied on by defendant as inferentially supporting his position is Dunaway v. Troutt (1960), 232 Ark. 615, 339 S.W.2d 613. We do not believe this decision in any way supports defendant's position. All this case holds is that, where there are two or more defendants, and the wealth of less than all are introduced into evidence, it is error to have punitive damages assessed against all defendants. The reason for this rule is that the court has no way of equitably dividing the judgment for punitive damages among the defendants."

We accept the view of the California court that it is not essential to show defendant's wealth in seeking exemplary damages.

It is asserted by appellants that the court committed error in submitting a form of verdict which permitted the jury to assess varying amounts of punitive damages as against the Union and Riviera and not as against Elias. This was in accordance with the court's instruction which advised the jury that punitive damages were sought as against the Union and Riviera but not as against Elias. The court further instructed the jury that the claims and allegations of the complaint were merely claims and not evidence, and must not be considered by the jury as evidence in the event it should undertake to determine the amount of plaintiff's damage. No objection was made to this instruction and the objection, under Rule 51 NRCP, was waived.

The proper rule, as stated in Annot., 62 A.L.R. 239, 240, appears to be:

"* * * that the jury, in an action against joint tortfeasors, may make awards for exemplary damages in different amounts, depending upon what the evidence shows and the jury finds to be the differing degree of culpability among the several defendants, seems to be in accord with the majority of the cases which have passed on this point."

In Thomson v. Catalina, 205 Cal. 402, 405, 271 P. 198, 200, 62 A.L.R. 235, the court said: "* * * juries should be allowed so to admeasure and apportion such exemplary damages as to make the example as well as the punishment fit the offense." Other authorities are cited by the parties on this point but we forego further discussion of it. We find no merit in the error assigned.

9. Appellants assign error in the court's holding that a new trial would be granted unless respondent should agree to a remittitur of the punitive damages in the amount of $30,000. This court has in many instances approved such conditional order on motion for new trial. Brownfield v. Woolworth Co., on petition for rehearing, 69 Nev. 297, 251 P.2d 589 (1952); rule acknowledged but not applied in Van Fleet v. O'Neil, 44 Nev. 216, 192 P. 384 (1920); see also 39 Am.Jur., New Trial § 213, at 205, 206; 20 R.C.L. 315.

Our brother Thompson, conceding that the rule followed by us is sometimes reached "in cases involving boycotts, lockouts, blacklists and the like" fears the consequences of establishing such rule in other fact situations. But the fact situation here is the very definition of a "boycott" or "walkout" as against Short. The Riviera's notice of termination, dated February 22, was mailed to Short on February 28 and received by Short on March 1. On that date he received the termination notice from his entire orchestra, and on the same day Short was notified by the stage manager of the hotel that his entire orchestra was staying,[2] under Elias, and that the Union said it was okey. This situation fits the rule that: "When an act done by an individual is not actionable because justified by his rights, though harmful to another, such act becomes actionable when done in pursuance of a combination of persons actuated by malicious motives and not having the same justification as the individual." When the Riviera and the Union stepped into the act, in the manner herein described,

---

[2] It is true that some of Short's orchestra members who left Short and went with Elias subsequently terminated their employment under Elias, but their original "walkout" was unanimous.

their actions, as well as those of Elias, became actionable as a tort.

Other matters are discussed in the briefs, all of which have been considered, but which do not require further discussion in this opinion.

The judgment and order denying new trial are affirmed with costs.

McNAMEE, J., concurs.

THOMPSON, J., dissenting:

This case was here before. Short v. Hotel Riviera, Inc., 79 Nev. 94, 378 P.2d 979. I did not participate in that opinion. Had I participated I would have voted to sustain the summary judgment which the district court had entered for defendants Hotel Riviera, Inc., Musicians' Protective Union, and Lewis Elias. It is my view of the law that Short did not then have a claim for relief, nor does he now have one. The trial of the case did not improve his legal position.

The trial record is extensive, but the controlling facts are few. Short conducted a relief band in Las Vegas, Nevada for the Mint Casino, the Thunderbird Hotel, the Sahara Hotel and the Riviera Hotel, on nights of the week when the orchestras regularly employed at those establishments were off duty. Short's contract with the Riviera as the relief band conductor was terminable at the will of either party. The musicians who worked for Short could quit at will. Riviera terminated Short's contract and hired Elias. It had a legal right to do so. Some of the musicians who worked for Short quit him and went to work for Elias. They were free to do so. Elias was surely entitled to solicit the Riviera job. The record does not disclose any effort by the Riviera or the Union to affect Short's contractual relationships with the Mint, the Thunderbird, or the Sahara, nor was his relationship with any of them affected. Short continued to conduct a relief band for those establishments after losing the Riviera job.

Short's charge against the defendants is that, in combination, they "conspired" to cause him damage. The nature of the conspiracy was to "pirate" his relief band and use it under a new conductor at the Riviera. The sequence of events, when viewed in a light most favorable to Short, may perhaps support an inference that the defendants (Riviera, Union and Elias) were so motivated. Yet, in my view, their conduct, singly or in concert, does not impose a liability to Short.

The power to terminate an employment contract at will does not give rise to a claim for damages in the employee upon discharge. A breach of contract does not occur when the power to terminate is exercised. Short was fully paid for the services he had actually performed for the Riviera. Upon termination, further performance by both parties alike was stopped, and without any legal damage to either. Precisely the same is true as to the relationship between Short and his musicians. Thus, Short's claim for damages does not, and cannot, rest upon a breach of contract, for there was no breach. A fortiori, there is no claim upon a theory that the Union and Elias induced Riviera or the musicians to breach an agreement with Short. His sole claim is bottomed upon one word—conspiracy—and its unwholesome connotation. However, the charge means nothing in the context of this case.

A conspiracy is not actionable unless the alleged combination results in the perpetration of an unlawful act or some injurious act by unlawful means. Bliss v. Southern Pacific Company, 212 Or. 634, 321 P.2d 324; 11 Cal.-Jur.2d 274. By definition, the alleged conspiracy is not actionable here. The combination, if it existed at all, did not perpetrate an unlawful act, nor were unlawful methods employed to bring about Short's discharge. What one may lawfully do, many may lawfully do in combination. This general principle was recognized in Carlton v. Manuel, 64 Nev. 570, 187 P.2d 558, though in a different factual framework. Bliss v. Southern Pacific Company,

supra, is squarely in point. There the plaintiff lumber company contended that the defendant railroad and its codefendant, another lumber company, conspired to cause the railroad to terminate the plaintiff's lease of railroad land which the plaintiff used for a loading dock, and then leased that land to the codefendant for the same use. The railroad had the right to terminate the lease upon giving 30 days' notice. It did so. The plaintiff's claim for relief was dismissed summarily before a trial. The Oregon Supreme Court affirmed, carefully pointing out that if the offending action charged was the termination of the lease, there could be no tort to support the alleged conspiracy because the act of the railroad was the result of the exercise of an absolute contractual right. The court quoted Prosser on Torts: "* * * No case has been found in which intended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means has been held to be actionable." The mere addition of the word "conspired" or "conspiracy" does not enhance the legal position of Short in the case at bar. May v. Santa Fe Trail Transportation Company, 189 Kan. 419, 370 P.2d 390; Bliss v. Southern Pacific Company, supra. Nor is reason, motive, intent or purpose a relevant inquiry, for Riviera and the other defendants had the right to do what they did. As the alleged conspiracy was to do that which they had the legal right to do, it was not to accomplish an unlawful purpose, nor were unlawful means used. Pearson v. Youngstown Sheet and Tube Company, 7 Cir., 332 F.2d 439.

The rule of law announced in the prior opinion, Short v. Hotel Riviera, Inc., 79 Nev. 94, at 106, 378 P.2d 979, at 986 is: "When an act done by an individual is not actionable because justified by his rights, though harmful to another, such act becomes actionable when done in pursuance of combination of persons actuated by malicious motives and not having same justification as the individual." It is, of course, true that there may be a point of combination beyond which the acts of each,

otherwise lawful, become unlawful. That point is sometimes reached in cases involving boycotts, lockouts, blacklists and the like. Prosser on Torts, 2d Ed., p. 731. Every case cited by this court in the first opinion to support the quoted rule of law is a case involving that kind of a situation. None of those factors are present in the instant matter. There is no underlying social policy involved here. The rule of law announced in the first opinion, and followed again here, was never intended to have application to this kind of a case. It is erroneously applied, and I worry about its implications. The majority opinion means that an employer is in peril if he discharges a union employee serving at will and, before discharging him, arranges with the union for a replacement. There are many union shops in Nevada. It is common practice to arrange in advance for the replacement of an employee about to be fired in order that one's business may continue smoothly and without interruption. A similar peril is imposed upon the union. It must not inform the employer that, upon the discharge of one of its members, another will be available as a replacement. Nor is the union member seeking employment free to solicit the job or the needed personnel to undertake it. When these events happen, sinister and malicious motives may be imputed to each alike and damages, both compensatory and punitive, authorized. The illusory "civil conspiracy" may be found by the trier of facts. That each defendant acted lawfully is of no significance. The discharged employee may be enriched nonetheless. Apparently, in these circumstances, our law will now permit money to be transferred from the so-called "civil conspirators" to the former employee. I cannot believe that this pronouncement is truly the law. Yet, it is the plain meaning of the holding of today's case.

My brothers apparently find some comfort in the "law of the case" doctrine. I do not. Nor would my view be different had I participated in the first opinion. The divergent views regarding that doctrine are fully explored in the annotation, 87 A.L.R.2d 271 and need not

526

be restated here. That doctrine should never be invoked to require the perpetuation of error. A court need not be ashamed to acknowledge its mistake and correct it before damage results. Though embarrassing, it is the only honorable course. I dissent.