BENNY SHORT, Appellant, *v.* HOTEL RIVIERA, INC., a Nevada Corporation, MUSICIANS' PROTECTIVE UNION, LOCAL NO. 369, A. F. of M. of Las Vegas, Nevada, and LEWIS ELIAS, Respondents.

No. 4550

February 27, 1963

378 P.2d 979

[Rehearing denied March 19, 1963]

*Morton Galane,* of Las Vegas, for Appellant.

*Woodburn, Forman, Wedge, Blakey and Folsom,* of Reno, for Respondent Hotel Riviera, Inc., a Nevada corporation.

*Berkson and Phillips,* of Las Vegas, for Respondent Musicians' Protective Union.

*Brown and Matteucci,* of Las Vegas, for Respondent Lewis Elias.

## OPINION

By the Court, BADT, C. J.:

This is an appeal from a summary judgment in favor of the three respondents above named. Short, appellant, had charged these three respondents with participating in a conspiracy for the purpose of obstructing and interfering with him in the pursuit of his occupation of conducting a relief band in the Las Vegas, Nevada, area, pursuant to which, among other things, the musicians in appellant's relief band were persuaded, induced, and enticed to terminate their employment under appellant, and to continue at the Hotel Riviera under the leadership of Elias, depriving appellant of their services during a period when he was under contract to fulfill other resort hotel engagements, all to appellant's damage, more particularly set forth.

Appellant assigns error in the court's order for a summary judgment in favor of the defendant union, the Riviera, and Elias on the ground that there were material issues of fact for determination. We are of the opinion that the assignment of error is well taken. Although we have approved the salutary purposes of the rule to the end that trials may be obviated when they would serve no useful purpose (Lockart v. Maclean, 77 Nev. 210, 361 P.2d 670; Franktown v. Marlette, 77 Nev. 348, 364 P.2d 1069; Dredge Corp. v. Husite Co., 78 Nev. 69, 367 P.2d 676; Scapecchi v. Harolds Club, 78 Nev. 290, 371 P.2d 815), we have never approved its use where material issues of fact remained for determination. Corn v. French, 71 Nev. 280, 289 P.2d 173; Parman v. Petricciani, 70 Nev. 427, 272 P.2d 492; Smith v. Hamilton, 70 Nev. 212, 265 P.2d 214. Confining ourselves for the moment to the single question as to the sequence of events appearing in the record, we do not think it can be said that no reasonable man could conclude from those facts and reasonable inferences to be drawn therefrom that the defendants did not conspire to injure the plaintiff or that he was not damaged thereby.

We turn now to the facts. These facts are derived from sundry discovery depositions, affidavits, the testimony taken at the hearing of a motion for a temporary injunction, and numerous exhibits received in evidence. In the Las Vegas area the bylaws of the local musicians' union precluded musicians from working more than six nights a week. In this situation the necessity of relief bands or relief orchestras arose which served the various resort hotels on the seventh night. Benny Short was the leader of such a relief orchestra, which he had organized in 1946. In the 16 years following he had recruited and trained such orchestra and enjoyed an excellent reputation. In 1960, the period involved herein, it played on the regular orchestra's night off at the Flamingo, Sahara, Thunderbird, and Riviera resort hotels and the Mint Club. Early in 1961 the hotel started a new production. Before the first night that Short would have played in relief, approximately January 8, 1961, the president of

the hotel requested permission from the union to replace Short with the regular house conductor. When the request was refused the president told union officials he would "terminate" Short. Subsequently Short inquired of these same officials if something was the matter and they replied that nothing was wrong. It elsewhere appeared, however, that there had been many complaints against Short's conducting. Approximately the same date as this latter conversation Elias, then chairman of the Union Trial Board, rejected appointment to a position on the union's executive board, saying he had an excellent chance to enter the relief band field.

On the 22d of February the hotel typed a termination notice to Short, but did not mail it. Then on the 28th Elias said he knew all the musicians in the Short band were going with him and that he had been offered the hotel job. On that date the hotel mailed the previously typed termination notice to Short, who received it on March 1. On the same date he received the termination notice from his entire band. The contractual relationships between Short and his band members and Short and the hotel were terminable at will, provided certain notice was given. It is not disputed that this provision of the contracts was performed. On that day Short was informed by the stage manager of the hotel that his entire band was staying (under Elias) and that the union had said it was okay.

Short still had contractual obligations with four clubs and it appeared that these would be in jeopardy if he failed to provide adequate music. Therefore on March 17, 1961, Short asked the union to waive the rules and permit him to conduct the house bands at the other clubs for one month, to enable him time to recruit a new band. The executive board of the union refused permission. A similar request was made on the 14th of April, which was also refused. After denying the permission to Short, the union granted similar privileges to Elias on March 24 and later dates.

During this period, starting with the evening of February 28, Elias solicited all the hotel jobs. While the orchestra was still employed by Short, though a few days

after their notice of resignation, all the members that had decided to go with Elias had a "get-together meeting" which was also attended by Elias. During this interval they also called upon the officers of the union to ascertain whether they had violated the union's bylaws, as charged, in accepting employment from Elias.

The plaintiff charges that the union acted out of actual malice, in an attempt to "get him" because of previous disagreements between him and the union officers.

Alleging these facts, appellant sought a judgment against the Riviera, the union, and Elias, charging them with an unlawful conspiracy, and alleging damage.

In the court below the learned district judge first denied the motion for summary judgment, saying in part, after referring to the testimony of the officers of the union and their "unequivocal statements":

"It is not enough to say that the Hotel Riviera Inc. had the right to discharge Benny Short. This I feel is unequivocal. Pursuant to the contract it had that right. But if coupled with a bad motive from the Union *and the interference of Lewis Elias in the organization of a band when other musicians were available* and the fact that Lewis Elias was on the Trial Board of a complaint against Benny Short, coupled with the fact that the Riviera Hotel did not enter into a contract with Lewis Elias for the taking over of Benny Short's band until the 22nd day of March 1961 gives rise to an implication—if coupled together—that the Plaintiff may be entitled to relief. As dim as the hopes of the Plaintiff may be from the factual standpoint in the Court's opinion, *the Court feels that it is not called to pass upon the question of controverted evidence* even though the opportunity to prevail on the part of the Plaintiff may be indeed negligible. It would be in the best interest, according to the rules of law, to let this matter be decided by a jury rather than on a preliminary motion *wherein the Court must of necessity weigh some of the testimony."* (Emphasis supplied.)

Thereafter the court granted a rehearing of the motion for summary judgment and granted the same,

saying in part: "The Union did what it had a right to do. And in spite of anything else, it could have been done through hatred, ill-will, malice or anything else. They had a right to bring a proceeding against Mr. Short. They had a right to try him in their tribunal. And he submitted to that jurisdiction. He exhausted all his remedies there. Now, whether they hated him or whether they didn't is wholly immaterial. They had a right to try him. [With regard to] the other defendant, the Riviera Hotel as appears from all of the evidence that I can recall, a situation arose during one of their shows where they were unhappy over the music situation. The president of the corporation called on the union officials and asked them to come in and counsel them. After that had been done the union officials stated that if rehearsals were granted, a couple of extra weeks time, that they thought the plaintiff would then be able to take care of the situation. The president of the hotel asked on a Saturday night to have the services of a relief band leader. That request was denied. The by-laws of the Union hold that they have a right to deny that request. Now, that too could have been done with ill will; it could have been done for spite; it could have been done for any reason in the world. But still I can't find where it is the basis for any law suit. Now, upon being rejected Mr. Goffstein of the Hotel Riviera stated, 'Well, if I can't have my men and that's all there is to be to it, I will have to terminate Mr. Short.' I can't for the life of me see, after reading all the authorities, after going over all the factual situation again any reason that this situation should be prolonged and therefore the motion for summary judgment on behalf of the defendants will be granted."

We are of the opinion that the court's first decision was right and its second decision wrong. The second opinion eliminates all consideration of the element of malice, all consideration of "the interference of Lewis Elias in the organization of [Short's] band when other musicians were available * * *," all consideration of "the fact that the Riviera Hotel did not enter into a

contract for taking over of Benny Short's band until the 22d day of March," and all consideration of the fact that to grant a summary judgment it would have to pass upon "the question of controverted evidence." All these elements were recited as the grounds for the first decision. They are still in the case, although ignored in the second decision.

It is true that in the discovery depositions witnesses categorically denied any concert with others in the performance of the asserted acts constituting the conspiracy. As has been seen, the Riviera had a complete legal right to cancel its contract with Short, upon giving the required notice. The members of Short's orchestra had the complete legal right to terminate their employment by him. The union had the right to interpret its regulations and bylaws and to act in accordance therewith. Elias had the right to recruit a relief orchestra and accept employment by the resort hotels. It cannot be said, however, that in the accomplishment of these acts in concert and under any and all conditions as to intent, motive, and malice they may not be held answerable in damages.

We have, then, to consider whether the denials contained in the discovery depositions, although undenied and unanswered, must be given full factual approval in support of the summary judgment. It has been almost unanimously determined that the contention that even though nothing has been offered discrediting the honesty of such deponents, their testimony must be accepted as true, and plaintiff's privilege of examining such deponents at a trial thus foreclosed, is without merit. In Arnstein v. Porter, 2 Cir., 154 F.2d 464, 470, 471, the court said: "We agree that there are cases in which a trial would be farcical. * * * But where, as here, credibility, including that of the defendant, is crucial, summary judgment becomes improper and a trial indispensable. It will not do, in such a case, to say that, since the plaintiff, in the matter presented by his affidavits, has offered nothing which discredits the honesty of the defendant, the latter's deposition must be accepted as

true. We think that Rule 56 was not designed thus to foreclose plaintiff's privilege of examining defendant at a trial, especially as to matters peculiarly within defendant's knowledge. * * * We do not believe that, in a case in which the decision must turn on the reliability of witnesses, the Supreme Court, by authorizing summary judgments, intended to permit a 'trial by affidavits,' if either party objects. That procedure which, so the historians tell us, began to be outmoded at common law in the 16th century, would, if now revived, often favor unduly the party with the more ingenious and better paid lawyer. Grave injustice might easily result."

In United States v. General Ry. Signal Co. (W.D.N.Y. 1952), 110 F.Supp. 422, 423–425, the court said: "Plaintiff has to rely upon its discovery from whatever source it may come for its cause of action for conspiracy to monopolize trade in violation of the Sherman Act. Generally, in anti-trust violations, the only source of evidence open to the plaintiff must come from the defendants, and from their acts, conduct, speech, writings and documents. * * * Movant asserts that there is no dispute as to the evidentiary facts and that the only inference which can be drawn by the Court from the facts is that movant has never been a party to any conspiracy and is entitled to summary judgment in its favor. Despite such contention by movant, the affidavits and briefs filed and the oral arguments of plaintiff and movant are replete with allegations, statements and discussion to the contrary. * * * The interest and credibility of those witnesses should be tested by cross-examination. * * * Movant has the burden of demonstrating clearly that there is no genuine issue of a material fact to be determined. Hoffman v. Partridge, 84 U.S.App.D.C. 224, 172 F.2d 275. * * * The various agreements between the defendants, their correspondence and notations found in their files, copies of many of them being attached to the McHugh affidavit should be explained by the authors, at least, and perhaps, by the officers and agents of the parties who could reap any benefit where such persons have knowledge of the facts and the rules of evidence are observed."

In MacDonald v. Du Maurier (S.D.N.Y. 1946), 75 F.Supp. 653, 654, the court said: "It does not follow from the fact that there is no direct evidence that Du Maurier heard of or read the plaintiff's works that the motion for summary judgment should be granted. Arnstein v. Porter, 2 Cir., 154 F.2d 464. Although Du Maurier has denied that she ever saw or heard of or had access to plaintiff's copyrighted works before the institution of this action, she is an interested witness. * * * It is for the triers of the facts to determine how much of her testimony, if any, is to be accepted or rejected."

In Colby v. Klune, 2 Cir., 178 F.2d 872, the court said: "We have in this case one more regrettable instance of an effort to save time by an improper reversion to 'trial by affidavit,' improper because there is involved an issue of fact, turning on credibility. Trial on oral testimony, with the opportunity to examine and cross-examine witnesses in open court, has often been acclaimed as one of the persistent, distinctive, and most valuable features of the common-law system. For only in such a trial can the trier of the facts (trial judge or jury) observe the witnesses' demeanor; and that demeanor—absent, of course, when trial is by affidavit or deposition—is recognized as an important clue to witness' credibility. When, then, as here, the ascertainment (as near as may be) of the facts of a case turns on credibility, a triable issue of fact exists, and the granting of a summary judgment is error. * * * Particularly where, as here, the facts are peculiarly in the knowledge of defendants or their witnesses, should the plaintiff have the opportunity to impeach them at trial; and their demeanor may be the most effective impeachment. Indeed, it has been said that a witness' demeanor is a kind of 'real evidence'; obviously such 'real evidence' cannot be included in affidavits."

In Johnson Farm Equipment Company v. Cook, 8 Cir., 230 F.2d 119, the first headnote reads: "A court is not at liberty to engage in a credibility evaluation for the purposes of a summary judgment."

In United States v. United Marketing Association, 8 Cir., 291 F.2d 851, the first headnote reads: "Summary judgment should not be granted if there remains a

genuine issue of material fact, and credibility of witnesses or of parties may be such genuine issue. Fed. Rules Civ.Proc. rule 56, 28 U.S.C.A."

In Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568, 573, the court said: "In cases of this kind where no single factor controls the equation, and the court is necessarily required to resolve the question of alleged intent in arriving at its judgment, we are of the opinion that justice can best be served by a trial of the question on its merits." Scores of cases are in accord with these views.

The rule is of course well recognized that in deciding the propriety of a summary judgment all evidence favorable to the party against whom such summary judgment was rendered will be accepted as true. Franktown v. Marlette, 77 Nev. 348, 364 P.2d 1069; Parman v. Petricciani, 70 Nev. 427, 272 P.2d 492.

Rule 56 authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try. Sartor v. Arkansas Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967. In McColl v. Scherer, 73 Nev. 226, 231–232, 315 P.2d 807, we for the second time approved the language of a federal case to the effect that the trial judge should exercise great care in granting motions for summary judgment, and held that a litigant has a right to trial where there is the slightest doubt as to the facts. In 6 Moore, Federal Practice, 2070, it is said that in such motions "the trial court should not pass upon the credibility of opposing affidavits, unless the evidence tendered by them is too incredible to be accepted by reasonable minds." And the burden of establishing the lack of a triable issue of fact is upon the moving party. 6 Moore, Federal Practice, 2070.

Opposing his appeal from the summary judgment in favor of respondents, respondents rely upon the theory, in addition to their assertion that there was no genuine

factual issue to determine, that the three respondents each did only that which it was entitled to do; that these were all disassociated, lawful acts, not accomplished in concert by any two or more of respondents and were not actionable.

Although respondents were represented by separate counsel and filed separate briefs, such in the main was the purport of each respondent's answering brief.

Since respondents also support the summary judgment by their contention that the complaint does not state a claim upon which relief can be granted, and since this is closely connected with the contention that no material issues of fact remained to be tried, it seems advisable to pass on this issue; this, despite the fact that our holding that the summary judgment was error because factual issues remained would in itself require a remand for trial.

Respondents assert that because the Riviera had a contractual right to terminate its contract with Short, and Short's musicians had a like right to terminate their employment with him, and Elias had a legal right to recruit a relief orchestra, and the union had a right to promulgate, interpret, and act under its bylaws, their exercise of these lawful rights in concert could not become for this reason unlawful. The authorities are not entirely in harmony on the question, and the facts vary greatly in the several instances in which the rule thus relied upon has been applied. Further confusion results from the language used by the courts and the text writers in discussing the same.

Respondents quote 11 Am.Jur. 578, Conspiracy § 46, as follows: "It has been asserted that a conspiracy cannot be made the subject of a civil action unless something is done which without the conspiracy would give a right of action. Moreover, in a considerable number of decisions the principle is broadly stated that where damages result from an act which if done by one alone would not afford a ground of action, a like act will not be rendered actionable simply because done by several in pursuance of an agreement. The number who unite to do an act cannot change its character from lawful to unlawful."

They also cite a number of cases in support of such statement. However, the text referred to proceeds immediately as follows: "A more reasonable view, however, is that where an act done by an individual, though harmful to another, is not actionable because justified by his rights, yet the same act becomes actionable when committed in pursuance of a combination of persons actuated by malicious motives and not having the same justification as the individual." Virtually the same statement is found in 15 C.J.S. 1003, Conspiracy § 8.

The United States Supreme Court has thus stated the rule: "An act lawful when done by one may become wrongful when done by many acting in concert, taking on the form of a conspiracy which may be prohibited if the result be hurtful to the public or to the individual against whom the concerted action is directed." Fed. Trade Comm. v. Raymond Co., 263 U.S. 565, 574, 44 S.Ct. 162, 164, 68 L.Ed. 448; Grenada Lumber Co. v. Mississippi, 217 U.S. 433, 440, 30 S.Ct. 535, 54 L.Ed. 826; Bedford Co. v. Stone Cutters Assn., 274 U.S. 37, 54, 47 S.Ct. 522, 71 L.Ed. 916.

"It is settled that 'an act lawful in an individual may be the subject of civil conspiracy when done in concert, provided it is done with a direct intention to injure another, or when, although done to benefit the conspirators, its natural and necessary consequence is the prejudice of the public or the oppression of individuals.'" A. T. Stearns Lumber Co. v. Howlett, 260 Mass. 45, 157 N.E. 82, 52 A.L.R. 1125.

"* * * persons have a right to combine together for the purpose of promoting their individual welfare in any legitimate way, but where the purpose of the organization is to inflict injury on another, and injury results, a wrong is committed upon such other; and this is so notwithstanding such purpose, if formed and executed by an individual, would not be actionable." Hawarden v. Youghiogheny & L. Coal Co., 111 Wis. 545, 87 N.W. 472, 474, 55 L.R.A. 828.

"* * * it is fallacious to say that an act which is lawful can never become unlawful, and equally fallacious to say that, though it is lawful for a person to refuse to sell to another, it is also lawful for the same person in

combination with others to likewise refuse to sell when such refusal forms part of a scheme * * * and is not the bona fide exercise of their right to refuse to sell." Klingel's Pharmacy v. Sharp & Dohme, 104 Md. 218, 64 A. 1029, 1032, 7 L.R.A., N.S., 976.

When an act done by an individual is not actionable because justified by his rights, though harmful to another, such act becomes actionable when done in pursuance of combination of persons actuated by malicious motives and not having same justification as the individual. Clark v. Sloan, 169 Okl. 347, 37 P.2d 263; Starmer v. Mid-West Chevrolet Corporation, 175 Okl. 160, 51 P.2d 786. Accord: Deon v. Kirby Lumber Co., 162 La. 671, 111 So. 55, 52 A.L.R. 1023; Ertz v. Produce Exchange Co., 79 Minn. 140, 81 N.W. 737, 48 L.R.A. 90; Brown v. Jacobs Pharmacy Co., 115 Ga. 429, 41 S.E. 553, 57 L.R.A. 547; Rosenblum v. Rosenblum, 320 Pa. 103, 181 A. 583; St. Luke's Hospital v. Industrial Commission, 142 Colo. 28, 349 P.2d 995; Texas Public Utilities Corporation v. Edwards, 99 S.W.2d 420 (Tex.Civ.App.); Ingo v. Kock, 2 Cir., 127 F.2d 667; Pfoh v. Whitney, 43 Ohio App. 417, 62 N.E.2d 744; Bankers' Fire & Marine Ins. Co. v. Sloss, 229 Ala. 26, 155 So. 371; Prosser, Torts (2d ed.) 731, 732. See 11 Harvard Law Review 449, 457.

Many other cases could be cited. The great weight of authority is in support of the rule last discussed and we accept the same as the correct one.

Respondents place great reliance on Carlton v. Manuel, 64 Nev. 570, 187 P.2d 558. We think the case distinguishable, although some of the language used, a large part of it dictum, would seem to support the minority rule first above discussed. Carlton, owner of a laundry route collected and delivered laundry for Manuel on a commission basis. His relationship with Manuel was that of an independent contractor. There was no continuing contractual relationship. Manuel, operating the IXL

Laundry, and all other laundries in Reno, reduced the commission of all laundry drivers. Plaintiff alleged a conspiracy among the laundries to reduce the commission of the route men, including Carlton. The case was decided under the theory of a monopoly of the laundry business by all the Reno laundries, and the plaintiff was denied relief because neither by statute in this state nor under the common law was a monopoly unlawful. The court observed that the legislature of the State of Nevada "had never deemed it advisable to enact any statute governing matters pertaining to monopolies, combinations, or restraints of trade, and consequently, in arriving at a determination of this matter, we are obliged of necessity to rely solely upon the principles of the common law pertaining thereto." The court then discussed at length the common-law doctrine, and rejected cases arising out of antitrust statutes, which were held to be but declaratory of the common law. In the course of his opinion EATHER, C. J., speaking for the court, said in approving the trial judge's order rejecting testimony as to a conspiracy: "If the testimony had indicated that a contractual relationship existed between appellant and respondent which continued for a specified term, and if said testimony had indicated that a combination or conspiracy was entered into for the purpose of destroying said contractual right, appellant's offered testimony with reference to the existence of a conspiracy might have been material." It would seem therefore that Carlton v. Manuel did not bind the court to adopt the minority rule here relied upon. Horsey, J., in concurring with reluctance, confines himself entirely to the question of monopoly and regretfully concurs because neither by statute nor under the common law was the laundry owner's act unlawful, though done in concert with all other laundry owners in the city who thus exercised a complete monopoly. Carlton v. Manuel has an entirely different background from the present case. In Carlton's case all the laundries in Reno had reduced the commissions of all the laundry drivers. This indicates an economic situation in which the laundries were, by reducing the

commissions, increasing the net proceeds of their business. They were not by such action singling out a particular driver. Nor did they have a contract with the drivers.

The judgment is reversed with costs, and the cause remanded to the district court for further proceedings in accordance with this opinion.

MCNAMEE, J., and WATERS, D. J., concur.

Justice Gordon Thompson being disqualified, the Governor commissioned Hon. Richard L. Waters, Jr., Judge of the First Judicial District, to sit in his place.