NAN WHISTON, Formerly Known as NAN ANDER, Appellant, *v.* ROBERT L. McDONALD, JOHN H. UHALDE, RAYMOND PLUNKETT, HAROLD B. TILLER, and LEONARD E. BOWSER, the Duly Elected, Qualified and Acting Trustees of the INCLINE VILLAGE GENERAL IMPROVEMENT DISTRICT; and CRYSTAL BAY DEVELOPMENT CO., a Nevada Corporation, Respondents.

No. 5708

August 28, 1969            458 P.2d 107

[Rehearing denied October 2, 1969]

*Nada Novakovich,* of Reno, for Appellant.

*Bible, McDonald, Carano & Wilson,* of Reno, for Respondents.

## OPINION

By the Court, ZENOFF, J.:

Nan Whiston and Albert Ander became husband and wife and resided in the Incline Village area, a new development at Lake Tahoe. With Albert apparently experienced or knowledgable of the garbage disposal business an exchange of conversations and letters took place with Arthur Wood, principal developer of the Incline project, with regard to the garbage disposal business at Incline. Nan apparently had sufficient funds to make certain financial commitments for the purchase of equipment. We do not know that she participated in any of the negotiations; there is an inference that she did not. Several entities appear in the exchange of correspondence, such as the Incline Village General Improvement District, Crystal Bay Development Company, Crystal Bay Disposal Company and Crystal Bay Disposal Co., *Inc*. Through it all, however, Arthur Wood or his attorney, Robert McDonald, did all of the negotiating for or through any or all of the entities. For the purposes of this present problem, the machinery of the negotiations may be disregarded except as hereinafter specified. It is necessary only to note that the transactions were between Arthur Wood and Albert Ander.

Nan brought suit against all of the pertinent entities except the Crystal Bay Disposal Co., Inc. She claims damages for breach of contract. Allegedly because of a letter of January 29, 1964 from McDonald, she and Albert went into performance. Apparently they could not get a business license, so Wood formed the Crystal Bay Disposal Co., Inc., the business license was obtained in its name, and by agreement of May 15th the corporation hired Albert under certain terms on a minimum plus percentage salary. Nan is not mentioned but in her deposition she admitted she knew of that agreement. The disposal business was operated by Nan and Albert as Crystal Bay Disposal *Company*. Nan and Albert had their marriage annulled and he assigned all of his rights under the May 15th agreement to her without notice to or knowledge of the corporation.

A few months later he quit. Upon Al leaving the business

the corporation through Wood terminated the deal and Nan claimed breach of contract.

The defendants moved to dismiss and moved also for summary judgment. For our present purposes it is not necessary to review the disposition of the motion to dismiss by the trial court because our affirmance of the granting of the summary judgment will dispose of the entire matter.

Appellant urges that the May 15th agreement between Albert and Crystal Bay Disposal Co., Inc., was assigned to her and that she could therefore require performance by the respondents. We find in this record unrefuted that the May 15th agreement superseded all prior agreements. It specifically so provided and Nan testified in her deposition that it was to supersede everything that went before it. Furthermore, by her conduct, Nan ratified the agreement of May 15th which was executed by Al Anders. For more than a year, without protest, she performed under that agreement, she allowed her equipment to be used and she accepted checks from one or more of Art Wood's corporations in the exact amount provided for in the May 15th agreement. In her own words she said: ". . . I immediately shot them down to my bank as deposits." In her memorandum executed in writing on July 9, 1965 Nan acknowledged and ratified the May 15th agreement. Fanning v. C. I. T. Corp., 192 So. 41 (Miss. 1939).

The May 15th agreement therefore became the contract between the parties and the January 29th agreement expired. By its terms the corporation hired Anders and the equipment as an employee and he was to pay the cost of operation from the monthly sums paid to him by the employer corporation. Principally the new contract was negotiated because the business was not profitable to the Anders, largely because of their difficulty in collecting from the customers. Neither were they able to get a business license. In order to assure the area of having a garbage pickup Wood formed the disposal corporation and hired Anders in the May 15th agreement.

It was after that transaction was effected that Nan and Albert had domestic difficulties which ended in an annulment. In their property settlement he assigned his interest in the equipment to her and claimed no interest in the business. After the annulment he quit. When the employer corporation learned that he had left they sought a disposal service elsewhere. It should be emphasized that the May 15th agreement contained no definite term or time period. Neither Nan nor Al had any tenure.

The main theme of the plaintiff's complaint is that the defendants breached the letter agreement of January 29, 1964. No reference is made by the complaint to the May 15, 1964 agreement. There is nothing offered by the plaintiff to support her position that the May 15th agreement merely modified the January 29th agreement. A comparison of the two agreements establishes that the latter agreement cannot be a modification of the former for reasons that are obvious in their differences.

All of the foregoing appears from the record supporting this summary judgment. Nowhere does appellant refute or controvert by affidavit, deposition or interrogatories. The adverse party may not rest upon the allegations in her pleading but must by affidavit or other evidentiary matter set forth specific facts showing a genuine issue for trial. Berryman v. International Bhd. Elec. Workers, 85 Nev. 13, 449 P.2d 250 (1969); Adamson v. Bowker, 85 Nev. 115, 450 P.2d 796 (1969); Dredge Corp. v. Husite Co., 78 Nev. 69, 369 P.2d 676 (1962).

Summary judgment is affirmed.

BATJER and THOMPSON, JJ., concur.

COLLINS, C. J., dissenting:

I respectfully dissent.

I am of the opinion there are genuine issues of material fact which should be determined at trial, and that it was error for the lower court to grant summary judgment in favor of respondents.

In deciding the propriety of a summary judgment, all evidence favorable to the party against whom such summary judgment was rendered will be accepted as true. Short v. Hotel Riviera, Inc., 79 Nev. 94, 378 P.2d 979 (1963). Likewise, we must draw every intendment in favor of the plaintiff against whom summary judgment was granted. Catrone v. 105 Casino Corp., 82 Nev. 166, 414 P.2d 106 (1966); Hamm v. Carson City Nugget, Inc., 85 Nev. 99, 450 P.2d 358 (1969). Moreover, the trial court is not limited to consideration of the affidavit and depositions relied on by the moving party but is required by NRCP 56(c) to consider all pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits when ruling on a motion for summary judgment. Adamson v. Bowker, 85 Nev. 115, 450 P.2d 796 (1969).

In July, 1963, Nan Whiston, formerly Nan Ander, bought a

piece of residential property from the Crystal Bay Development Co. at Incline Village, Lake Tahoe, Nevada, and met Arthur Wood, President, personally. They discussed trash hauling, and she mentionend that Albert Ander, who lived in California, was experienced in refuse removal.

On October 31, 1963, Mr. Wood, President of the Development Co., by letter invited Albert to present a plan for disposing of garbage for the Incline Village area. Albert made a detailed written proposal by undated letter sometime prior to January 29, 1964.

On January 29, 1964, a letter from the Incline Village General Improvement District signed by Robert L. McDonald, President, addressed to Albert and Nan, informed them, in words identical to Albert's letter to the Development Co., that the District would enter into a contract with them for garbage disposal at Incline Village. This letter required the furnishing of two new trucks, one used truck, and commercial bins; the sale of rubbish barrels; the installation of an incinerator; weekly or daily pickup of rubbish as required; public liability and property damage insurance; establishment of a fixed residential and commercial rate; payment of 10 percent of the gross amount collected to the District, later to be increased to 15 percent and finally to 20 percent; and compliance with all laws and statutes. The letter further provided that the contract was to run for a 10-year term.

On February 11, 1964, Mr. Wood, President of the Development Co., wrote a letter "To Whom It May Concern," advising that Crystal Bay Disposal Company (organized by Nan) was authorized to pick up and dispose of all rubbish and garbage at Incline Village.

On April 3, 1964, John H. Uhalde, Manager of the District, issued a statement in writing to all "Residents of Incline Village" that it was the political body responsible to carry out the work of collection, transportation and disposal of *all* garbage and rubbish within the boundaries of the District and that the District had hired the Disposal Company to furnish those services commencing April 1, 1964.

On February 1, 1964, Nan and Albert commenced garbage collection pursuant to the January 29 letter from McDonald. No formal written contract was drawn nor signed by either party. Nan, who was financially able, purchased the trucks and other equipment on her individual account and credit. The inference is that Albert was without financial resources but knew the garbage disposal business.

On April 21, 1964, the Disposal Company entered into a

written contract with the Carson City dump for a period of one year at $150 per month. This was in lieu of incinerating the garbage at Incline Village. Some legal difficulty arose over that plan.

When Nan and Albert had difficulty in collecting monthly payments in advance from their residential customers, which in turn caused them difficulty in meeting their monthly truck and other payments, Nan discussed the problem with Mr. Wood. He told her they (either the Development Co. or the District) would demand payment of the garbage bills and, to insure collection, would put the charges on the water bill. There were also customers outside the District who were billed by one of Mr. Wood's companies.

Even that plan didn't work well, however, and Nan testified she could never get the details as to what accounts were collected or the amount due her Disposal Company from the District or the Development Co.'s accountants. Nan testified she had considerable sums of money due but not remitted to her.

Nan testified in her deposition that the Crystal Bay Disposal *Company,* a fictitious firm name, was her business, the certificate was in her name alone, she had financed the trucks and equipment purchased alone, and Albert was merely a manager until about August, 1965, after which she ran the business alone.

On April 1, 1964, the Sheriff of Washoe County issued to Crystal Bay Disposal *Co., Inc.,* a business license to dispose of garbage at Incline Village.

On May 15, 1964, for a reason not clearly shown or understandable from the record,[1] Mr. Wood wrote the District confirming an agreement between the District and a new company organized by Mr. Wood, called Crystal Bay Disposal *Co., Inc.* (a separate company altogether from Crystal Bay Disposal *Company,* a fictitious firm organized by Nan), for an exclusive 10-year franchise to collect garbage within the District. The letter related that the District was to be responsible for the billing and collection, to be remitted to Disposal *Co., Inc.,* in accordance with a certain schedule. The letter asked the District to signify its acceptance by signing and returning a copy of the letter. Whether this was done is not shown in the record. Nor is there anything shown in the record of the action of the

---

[1]Neither the deposition of Mr. Wood nor that of Albert is in the record on appeal, although referred to in respective counsel's briefs; we may not consider that evidence. A Minor v. State, 85 Nev. 323, 454 P.2d 895 (1969).

District in its dealings with Nan and Albert pursuant to the January 29 letter, under which garbage was then being collected.

Also on May 15, 1964, Mr. Wood, on behalf of Disposal *Co., Inc.,* wrote Albert individually, stating that Disposal *Co., Inc.,* would employ Albert and his equipment (meaning the equipment purchased and financed individually by Nan) to make garbage collections within Incline Village and other areas. Mr. Wood stated that Albert would receive a minimum of $14,700 per year, payable monthly, or, if Disposal *Co., Inc.,* prospered, 95 percent of the net profits, whichever was greater.

Disposal *Co., Inc.,* was to pay all operating expenses incident to the collection of the garbage, with the exception of the equipment payments (on Nan's equipment), which Albert was to pay. The District was to bill and collect the monthly charges and remit the same to Disposal *Co., Inc.* The letter then contained the following paragraph:

"This memorandum agreement supersedes all prior agreements, whether oral or written, between *you* and the District and/or Crystal Bay Development Co." (Emphasis supplied.)

If Albert agreed, he was to sign and return a copy of the letter to Mr. Wood, which he did.

Nothing is shown in the record on appeal by what authority Mr. Wood had the right to bargain on behalf of the District. Nan was not mentioned, nor was the agreement with the District, dated January 29, 1964, referred to.

In her deposition, Nan testified she was not aware of the agreement of May 15, 1964, between Wood and Albert; that she wasn't in agreement with it; that she thought she should have been consulted about it; that the discussion between Wood and Albert which led to the letter was the result of the billing and collection difficulties the Disposal *Company* was having; that she had had some discussion previous to the May 15 letter with Albert, but it was not affirmative on her part; that Albert told her about it later but not before agreeing to it; that she was not sure who finally told her about the May 15 letter but she thought it was Albert; that she didn't see it near the date of May 15, but that she did see it later but can't remember when; that in talking with Mr. Wood she would find something out maybe weeks later; that she was not aware of the formation of Crystal Bay Disposal *Co., Inc.* (as distinguished from Crystal Bay Disposal *Company*); that she was confused in dealing with so many companies, including District, Development Co., and Disposal *Co., Inc.,* but that Mr. Wood seemed to be in control of them all.

On August 20, 1964, Albert assigned his interest in the three garbage trucks, a boat and trailer, and a California business to Nan.

On October 9, 1964, the marriage between Nan and Albert was annulled because he had a previous wife still living when he married Nan.

Between May and December, 1964, some 15 checks were drawn by Development Co. or Disposal *Co., Inc.,* to Disposal *Company,* in the total amount of $12,365.89. Each was deposited by Nan, and it is principally for this action on her part that the majority opinion holds she ratified the May 15 agreement between Wood and Albert. Some of the checks, however, carry the notation, "Contract services per agreement for month of May 1964."; others are mere advances for purchase of equipment and supplies; others indicate, "A/C Rec. Crystal Bay Disposal Co., Inc." or "May draw per agreement." There is one slight reference to the handling of these checks by Nan in her deposition. She testified that when she received the checks payable to Disposal *Company* she mailed them ". . . to the Security First National Bank at Carson and Woodruff, for deposit, in Long Beach; . . . and they were authorized, as I stated before, to take out their truck payments before anything else. And then my repairs and things like that were also taken out of this checking account." That appears to me exceedingly skimpy evidence upon which the majority of this court relies to hold as a matter of law that she ratified the May 15 agreement. The authorities do not support that holding unless as a matter of fact Nan had full knowledge of the transaction. Yellow Jacket Silver Mining Co. v. Stevenson, 5 Nev. 224 (1869). See also Rankin v. New England & Nev. Silver Mining Co., 4 Nev. 78 (1868); Clarke v. Lyon County, 7 Nev. 75 (1871); Edwards v. Carson Water Co., 21 Nev. 469, 34 P. 381 (1893).

On February 6, 1965, Nan executed a chattel mortgage and promissory note to purchase a 1965 Chevrolet pickup for the garbage operation at Incline Village.

On February 18, 1965, Mr. Wood, as President of Development Co., wrote the Security First National Bank, Long Beach, California (where Nan had financed two of the garbage trucks she had purchased), advising the bank that "The Incline Village General Improvement District is not in a position to legally enter into a long term contract with Crystal Bay Disposal Co. [sic]". Mr. Wood also wrote, "Until such time as a long term contract can be negotiated[,] Crystal Bay Development Company [sic] is subsidizing the garbage operations here

at its development known as Incline Village. In connection with the acquisition of a 1965 tilt cat Chevrolet diesel truck with a special body and facility to handle garbage [the identical truck purchased by Nan] Crystal Bay Development Company [sic] will pick up the remainder of your $14,000 note if Crystal Bay Disposal Co. [sic] *should happen to lose the garbage contract.*" (Emphasis added.)

On July 8, 1965, Nan and Albert entered into a memorandum agreement in writing reciting that "Albert Ander executed a letter agreement with Crystal Bay Disposal Company, [sic] Inc. by Arthur L. Wood, dated May 15, 1964, which said letter agreement purports to be between Al Ander, individually, and Crystal Bay Disposal Co., [Inc.]. . . ." and further stated the fact of the annulment of their marriage. The agreement then provided: "The undersigned parties do hereby certify that all interest of Albert Ander, pursuant to the letter agreement [May 15 letter from Wood to Albert] *and any and all other similar agreements,* is the sole and separate property of Nan Whiston dba Crystal Bay Disposal Co. [sic] The undersigned parties do further hereby certify that Albert Ander is employed by Nan Whiston dba Crystal Bay Disposal Co. [sic] as general manager of the said firm and that he has no financial interest therein." No notice of this assignment was given to any of the several companies, the District, or any of the persons mentioned above.

On September 3, 1965, Albert and one Gene Lemons submitted a letter proposal to the District, seeking the garbage collection and disposal business. The letter recited that Albert had rendered a similar service over the past 18 months and that a survey of over 300 people indicated that customers had been happy with the service. No mention was made of Nan. In the meantime, Albert, who was still working for or with Nan, leased still another garbage truck. Nan paid the license fees on behalf of Crystal Bay Disposal *Company.* Regarding the meeting at which Albert and Lemons submitted the above proposal, Nan had this to say in her deposition: "Mr. Wood and I don't know who all was there—unknown to me. And I was up here in the area. And all this transpired between these men. But I certainly wasn't called in on any meeting, but I am the one with the contract; I am the one getting shoved around. . . . I didn't know there was even a meeting transpired. I am up here hauling and picking up their own trash and rubbish and things. And behind my back these men are getting together and deciding—."

On August 26, 1965, Emile Gezelin, attorney for Nan, wrote

Robert McDonald, indicating that at a conference Mr. Wood indicated he intended to negotiate with Reno Disposal Company on the garbage contract. He stated, "I feel that before Crystal Bay Development is in any position to negotiate with anyone, that the Whiston matter must either be equitably disposed of, or that a written contract be entered into between Crystal Bay Development and Mrs. Whiston as is outlined in your letter of January 29, 1964."

On September 20, 1965, Mr. McDonald wrote Mr. Gezelin as follows: "The *Incline Village General Improvement District* duly and regularly called a meeting approximately two weeks ago [about September 6] and passed a resolution wherein the Board will enter into a contract with Reno Disposal Company for the hauling of the garbage in the Incline Village area and at that meeting called Mr. Devencenzi of that company. His company started hauling garbage the following day. I would appreciate it if you would advise Mrs. Nan Whiston to remove her truck or trucks from the area and to quit hauling garbage forthwith."

On September 21, 1965, Albert quit working for Nan and the Disposal *Company*. He turned the use of the one leased truck over to Reno Disposal Company and showed their men the garbage collection routes. This was without Nan's agreement or consent.

Also on September 21, 1965, Mr. Gezelin again wrote Mr. McDonald, advising that the District and Nan had entered into a contract on January 29, 1964, and that McDonald's letter of September 20 was considered a breach of that contract. On approximately the same date Nan wrote Mr. McDonald as President of the District, advising that she was ready, willing and able to perform the contract of January 29, 1964.

Additionally, a petition signed by approximately 164 residents of Incline Village was offered, advising that "the Crystal Bay Disposal Company [Nan's company] has rendered excellent service during the past year and we want their service continued."

In her deposition, Nan testified that, as a result of respondents' conduct, she lost her business in Long Beach, California, lost her house and another lot at Incline Village, lost her trucks, lost some $3,600 in garbage bins, has pending many law suits, has had default judgments entered against her, and has liens on her home.

It is in the face of that kind of evidence the majority of this court approved the entry of summary judgment against Nan. I say if a case ever cried out for trial on the merits, this case

does. And that trial is warranted even though Nan may not prevail at trial. It is said in 3 Barron & Holtzoff, Federal Practice and Procedure § 1235 at 141 (Rules ed. 1958): "[A] hearing on a summary judgment motion is not a trial on the merits, and . . . the court on such a motion should not attempt to resolve conflicting contentions of fact; the party opposing the motion is required to show only that there is a genuine issue to be tried and not that he will prevail at the trial." It is also said in 6 Moore's Federal Practice ¶ 56.11[7] at 2084 (2d ed. 1966) that:

"It is not the purpose of a hearing on a motion for summary judgment to resolve factual disputes. Rather, it is to determine whether there are factual issues to be tried." (Footnote omitted.)

And in dealing with the type of proof which may be considered in ruling upon a motion for summary judgment, Moore, supra, ¶ 56.15[8] said at 2163:

"The materials which the court is entitled to consider at the hearing on the motion for summary judgment are: (a) the pleadings; (b) affidavits which meet the testimonial requirements of Rule 56(e); (c) depositions; (d) answers to interrogatories; (e) admissions; (f) oral testimony; (g) documentary and other evidentiary materials. The court should also consider facts which are the subject of judicial notice. . . .

"While it is clear that a summary judgment may be rendered solely on the basis of affidavits, affidavits are, as a general proposition, the least trustworthy basis, since the affiant has not been subject to cross-examination and his demeanor is not observable." (Footnotes omitted.)

It was held in Whitaker v. Coleman, 115 F.2d 305, 307 (5th Cir. 1940): "Summary judgment procedure is not a catch penny contrivance to take unwary litigants into its toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their right of trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists."

As stated earlier in this opinion, the depositions of Mr. Wood and Albert are not in the record on appeal before this court. We may not consider them in reviewing the action of the lower court in granting summary judgment. A Minor v. State, supra.

The trial court, in its ruling on the motion, engaged in a very unusual practice. It entered "Findings of Fact" in which it refused to accept as true, facts favorable to appellant and

drew inferences against her when those inferences should have been drawn in her favor. For instance, the trial court found as a matter of fact that the letter of January 29, 1964, was not a contract but only preliminary to a contract; that Disposal *Co., Inc.,* and Albert entered into a contract on May 15, 1964, for employment of himself and his equipment to haul garbage; that the agreement between Nan and Albert on July 8, 1965, recognized the agreement of May 15, 1964, between Albert and Disposal *Co., Inc.*; and that neither Nan nor Albert gave notice of their written agreement to anyone.

The court concluded as a matter of law that there was no contract resulting from the January 29, 1964, letter, and no breach by the District or the Development Co.; and that Albert's duties or obligations under the contract of May 15, 1964, were not assignable without notice and approval. Summary judgment was entered against Nan.

The issues of fact that I see in this record that require a trial are these:

(1) Did a contract result between the District as one party and Nan and/or Albert as the other party as a result of the January 29 letter and the subsequent conduct and action of the parties?

(2) What authority, if any, did the District and the Development Co. have to enter into a 10-year franchise for garbage collection in May, 1964, in view of the District's dealing with Nan and Albert?

(3) What authority, if any, did Arthur Wood have in negotiating with Albert through the Development Co. by the May 15, 1964, letter, which could affect Nan's rights, if any, under the January 29 letter?

(4) Was Albert purporting to act as Nan's agent in dealing with Wood incident to the May 15 letter?

(5) Is the District estopped from raising the statute of frauds as a defense against Nan and/or Albert under the January 29 letter? (See Harmon v. Tanner Motor Tours, 79 Nev. 4, 377 P.2d 622 (1963).)

(6) Should promissory estoppel allow Nan reliance damages against the District?

(7) Were the January 29 and/or May 15 agreements assigned to Nan by Albert? And could she require the performance of the District and/or Development Co.?

(8) Was the May 15 agreement merely a modification of the January 29 agreement relating to terms of payment?

(9) Is Disposal *Co., Inc.,* merely the alter ego of Development Co.? (See McCleary Cattle Co. v. Sewell, 73 Nev. 279, 317 P.2d 957 (1957).)

(10) What control does Arthur Wood exert over the District, a quasi-public body?

(11) Did Nan ratify the May 15 agreement between Disposal *Co., Inc.,* and Albert? This is a point raised *sua sponte* by this court. The parties below did not have the point in mind, no facts were directed toward it, the trial court did not consider it, it was not specified as error or argued before us, and we have not asked for additional briefs concerning it.

I would reverse the summary judgment and remand the case for trial, with opportunity to both parties to amend their pleadings to clarify the issues to be tried.

For the foregoing reasons, I respectfully but earnestly dissent.

MOWBRAY, J., concurs in the foregoing dissent.