NEVADA STATE BANK, a Nevada Corporation, Appellant/Cross-Respondent, v. THE JAMISON FAMILY PARTNERSHIP, a Nevada Limited Partnership; THE GOLDEN SPIKE CORPORATION, a Nevada Corporation, dba CHUCK'S GOLDEN SPIKE CASINO; D.I. JAMISON; CLAIRE JAMISON and J.R. ("SPIKE") JAMISON, Respondents/Cross-Appellants.

No. 20468

November 28, 1990                                    801 P.2d 1377

*Jolley, Urga, Wirth & Woodbury* and *Jay Earl Smith,* Las Vegas, for Appellant/Cross-Respondent.

*Allison, MacKenzie, Hartman, Soumbeniotis & Russell* and *Karen A. Peterson,* Carson City, for Respondents/Cross-Appellants.

## OPINION

*Per Curiam:*

### THE FACTS

On November 8, 1977, Nevada State Bank (Bank) loaned $1,000,000.00 to the Jamison Family Partnership and the Golden Spike Corporation (Golden Spike). The loan was originally secured by the Golden Spike Casino, a thirty-seven (37) acre parcel of real property located in Henderson, Nevada, and a pledge of 3,439 shares of Greyhound stock. However, within two years of the loan, the Bank had relinquished its security interest in the Henderson property and the Greyhound stock. D.I. Jamison was a general partner of the Jamison Family Partnership, as well as a director of the Bank, at the time the loan was made and

when the Bank released its security interest in the stock and real property.

Golden Spike and the Jamison Family Partnership defaulted on the loan, and on April 15, 1981, Golden Spike filed a petition in the United States Bankruptcy Court for relief and reorganization under Chapter 11 of the United States Bankruptcy Code. On February 9, 1982, the terms of the loan agreement between Golden Spike and the Bank were modified pursuant to a plan for reorganization, but another default, this time on the modified loan agreement, caused the Bank to schedule a trustee's sale of the Golden Spike Casino for April 26, 1985.

On April 26, 1985, Golden Spike forestalled the trustee's sale by filing a second petition for relief under Chapter 11 of the United States Bankruptcy Code. Shortly thereafter, Golden Spike and the Bank entered into a stipulation and order for relief from the bankruptcy automatic stay. Pursuant to the stipulation, the Bank agreed to continue the trustee's sale, previously set for April 26, 1985, on one month intervals upon receipt of $16,000.00 each month. By August 15, 1985, the remaining amounts due on the loan were to be paid in full. The stipulation and order provided that there would be "no further continuances beyond the August 15, 1985, foreclosure sale date, unless agreed to in writing by Nevada State Bank and the debtor."

Golden Spike did not repay the remaining amounts due on the loan by August 15, 1985, and the Bank—without an agreement in writing from Golden Spike to do so, continued the trustee's sale by the trustee's public announcement on monthly intervals up to October 1, 1985, upon receipt of $16,000.00 for each month that the sale was continued. On October 1, 1985, the trustee's sale was postponed again until November 1, 1985, and then again to November 4, 1985, and then once more to November 12, 1985. On November 7, 1985, D.I. Jamison received a letter from the Bank wherein the Bank offered not to sell the Golden Spike Casino as long as it continued to receive monthly payments of $16,000.00. This letter warned D.I. Jamison that in order to accept this offer, the Bank would have to receive a payment of $16,000.00 by 12:00 p.m. on November 12, 1985.

When the Bank did not receive a $16,000.00 payment on the loan by 12:00 p.m. on November 12, 1985, the Bank held a trustee's sale of the Golden Spike Casino at 4:00 p.m. that same day. The Bank was the only bidder at the sale and purchased the casino with a credit bid of $400,000.00.

On January 14, 1986, the Jamison Family and Golden Spike filed a complaint in the district court against the Bank, but voluntarily dismissed this complaint two days later pursuant to

NRCP 41(a)(1) because the suit had not been approved by the bankruptcy trustee. The Bank was not served with this complaint, but after hearing about it in the news media, answered it on February 7, 1986, some three weeks after the complaint had been voluntarily dismissed. Attached to the Bank's answer were five counterclaims.

On February 11, 1986, the Jamisons and Golden Spike filed a second complaint alleging, among other things, that the trustee's sale of the Golden Spike Casino was not conducted in a commercially reasonable fashion, and that the Bank had breached the stipulated agreement precluding any trustee sales beyond August 15, 1985, without a written agreement between the Bank and the debtor to do so. On February 12, 1986, the Bank's opportunity to make a claim for a deficiency judgment pursuant to the trustee's sale expired. *See* NRS 40.455.

On March 5, 1989, the Bank responded to the second complaint with another answer and the counterclaims it had erroneously filed against the dismissed complaint. The first counterclaim requested a deficiency judgment; the second alleged D.I. Jamison breached a fiduciary duty; and the fourth asserted D.I. Jamison was personally liable for the deficiency judgment asserted in the first counterclaim.

Ruling upon cross-motions for summary judgment, the district court dismissed all of the above-mentioned claims for relief and counterclaims, and this appeal followed.

### SUMMARY JUDGMENT

Summary judgment is appropriate only where there are no genuine issues of fact to be resolved, and one party is entitled to judgment as a matter of law. NRCP 56(c); Leven v. Wheatherstone Condominium Corp., 106 Nev. 307, 309, 791 P.2d 450, 451 (1990). A litigant has the right to a trial where there remains the slightest doubt as to remaining issues of fact. Oak Grove Inv. v. Bell & Gossett Co., 99 Nev. 616, 623, 668 P.2d 1075, 1079 (1983). In deciding whether to grant a motion for summary judgment, the court should review the evidence in a light most favorable to the party against whom summary judgment may be rendered. *Id.*

### THE BANK'S DEFICIENCY JUDGMENT COUNTERCLAIMS

The opportunity to make a claim for a deficiency judgment resulting from the trustee's sale of the Golden Spike Casino

expired on February 12, 1986, pursuant to NRS 40.455.[1] The second complaint was filed on February 11, 1986, and the Bank filed its answer and counterclaims requesting a deficiency judgment on March 5, 1986. Therefore, the second complaint was filed one day prior to the expiration of the statute of limitations, but the Bank filed its answer and counterclaims for a deficiency judgment twenty-three (23) days after the statutory deadline for filing such claims. For this reason, the district court judge ruled the Bank's first and fourth counterclaims were barred by the statute of limitations. However, the district court also ruled the Bank could assert its deficiency judgment claims as an affirmative defense of recoupment.[2]

## A. Tolling.

First, the Bank argues the district court erred when it refused to toll the statute of limitations against the Bank's compulsory counterclaims. We disagree.

The Bank's first and fourth counterclaims for deficiency judgments were compulsory counterclaims because they arose out of the same transaction or occurrence as the subject matter of the opposing complaint. *See* NRCP 13. This court has not previously considered whether a plaintiff, by instituting an action before the expiration of a statute of limitation, tolls the running of that statute against compulsory counterclaims filed by the defendant after the statute has expired.[3]

---

[1]NRS 40.455, as it appeared at the time the complaint and counterclaims were filed in 1986, provided:

> 40.455. Deficiency judgment: Award to judgment creditor or beneficiary of deed of trust.
>
> Upon application of the judgment creditor or the beneficiary of the deed of trust within 3 months after the date of the foreclosure sale or the trustee's sale held pursuant to NRS 107.080, respectively, and after the required hearing, the court shall award a deficiency judgment to the judgment creditor or the beneficiary of the deed of trust if it appears from the sheriff's return or the recital of consideration in the trustee's deed that there is a deficiency of sale proceeds and a balance remaining due to the judgment creditor or the beneficiary of the deed of trust, respectively.

[2]Recoupment is a common law remedy designed to avoid the harsh results of a statute of limitations. Stulz v. Boswell, 453 A.2d 1006, 1009 (Pa. Super.Ct. 1982). Generally, the doctrine of equitable recoupment reduces or extinguishes any judgment the plaintiff is awarded, but does not allow the defendant to pursue damages in excess of the plaintiff's judgment award. *See,* Vari-Build, Inc. v. City of Reno, 622 F.Supp. 97 (D.Nev. 1985).

[3]In French Bouquet Flower Shoppe v. Hubert, 106 Nev. 835, 793 P.2d 835 (1990), this court ruled that the swearing of a witness who gives testimony is

Those jurisdictions in favor of tolling generally reason that a primary purpose for a statute of limitations—to afford parties needed protection against the evidentiary problems associated with defending stale claims—is negated where the evidence to support the compulsory counterclaim will be similar or identical to the evidence used to support the complaint. *See* Armstrong v. Logsdon, 469 S.W.2d 342 (Ky. 1971); Azada v. Carson, 252 F.Supp. 988 (D.Haw. 1966); Lewis v. Merrill, 365 P.2d 1052 (Or. 1961). "Thus, once a party files an affirmative action, he cannot thereafter profess to be surprised . . . or prejudiced by . . . compulsory counterclaims that stem from that action." Allie v. Ionata, 503 So.2d 1237, 1240 (Fla. 1987).

However, this analysis does not go far enough. While statutes of limitations are intended to protect a defendant against the evidentiary problems associated with defending a stale claim, these statutes are also enacted to "promote repose by giving security and stability to human affairs . . . . They stimulate to activity and punish negligence." Wood v. Carpenter, 101 U.S. 135, 139 (1879). In this case, it is questionable whether stale claims and lost evidence represent the paramount concern addressed by a three-month statute of limitation. Since the statute also addresses viable concerns other than stale evidence, it should be enforced.

Nonetheless, equity is also a consideration, and for this reason, we hold the district court did not err when it ruled the Bank could assert its deficiency claims in an affirmative defense of equitable recoupment. Accordingly, we affirm the district court's ruling that a plaintiff, by instituting an action before the expiration of a statute of limitation, does not toll the running of that statute

sufficient to commence trial and thus toll the limitations period specified in NRCP 41(e) against the complaint. Similarly, *French Bouquet* ruled that compulsory counterclaims under these circumstances should not be dismissed under the statute of limitations.

However, we conclude that there is an important distinction between the ruling in *French Bouquet* and the question which asks whether a plaintiff, by instituting an action before the expiration of a statute of limitations, tolls the running of that statute against compulsory counterclaims filed by the defendant after the statute has expired. In *French Bouquet,* the same rule of law was applied equally to all parties, and favored the parties in a similar fashion. In the case at hand, the parties would not be similarly treated if the court were to rule that the statute of limitations is tolled against compulsory counterclaims upon the filing of a complaint prior to the expiration of the statute. Such a ruling from this court would favor the party who neglected to timely file their claim within the statutory period, and disfavor the party who was careful to file their claim in a timely manner. Therefore, we conclude that the ruling in *French Bouquet* is not controlling here.

against compulsory counterclaims filed by the defendant after the statute has expired. We also affirm the district court's conclusion that while the statute of limitations is not tolled, the defendant can nonetheless assert his claim as an affirmative defense of recoupment.

### B. Estoppel.

Next, the Bank contends the district court erred when it refused to estop the statute of limitations defense. Here the Bank argues it was induced to detrimentally rely upon the first complaint filed in this case. We disagree.

Equitable estoppel operates to prevent a party from asserting legal rights that, in equity and good conscience, they should not be allowed to assert because of their conduct. United Brotherhood v. Dahnke, 102 Nev. 20, 22, 714 P.2d 177, 178-179 (1986). The defense of estoppel requires a clear showing that the party relying upon it was induced by the adverse party to make a detrimental change in position, and the burden of proof is upon the party asserting estoppel. In Re MacDonnell's Estate, 56 Nev. 504, 508, 57 P.2d 695, 696 (1936).

Since the Bank was never served with the first complaint, but rather answered the complaint after discovering it through the news media, the Jamisons and Golden Spike did not induce the Bank's reliance upon that complaint, and the district court did not err when it elected not to estop the Jamisons and Golden Spike from asserting a statute of limitations defense. We affirm the district court on this issue as well.

### THE BANK'S SECOND CLAIM FOR RELIEF

The Bank alleged in its second counterclaim that sometime between November 8, 1977, and November 12, 1985, D.I. Jamison breached his fiduciary duty to the Bank by wrongfully using his position and influence as a member of the Bank's board of directors to obtain a release of the deed of trust on the Henderson parcel of real property and the 3,439 shares of Greyhound stock. Pursuant to a motion for partial summary judgment, the district court dismissed this counterclaim, reasoning that it was barred under a three-year statute of limitation.

A breach of fiduciary duty is fraud and, therefore, the three-year statute of limitation set forth in NRS 11.190(3)(d) is applicable. Shupe v. Ham, 98 Nev. 61, 64-65, 639 P.2d 540, 542

(1982). However, the statute of limitation will not commence to run until the aggrieved party knew, or reasonably should have known, of the facts giving rise to the breach. *Id.* The Bank contends it did not discover the evidence indicating the alleged breach of fiduciary duty until the foreclosure sale. "When the plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of his cause of action is a question of fact for the trier of fact." *Oak Grove Inv.*, 99 Nev. at 623, 668 P.2d at 1079. We conclude a viable issue of fact exists regarding when the Bank knew, or reasonably should have known, of the facts surrounding this breach of fiduciary duty counterclaim and, accordingly, we reverse the district court's grant of summary judgment on this issue.

## THE COMPLAINT'S FIRST AND SECOND CLAIMS FOR RELIEF

Next, the Jamisons and Golden Spike argue that viable issues of fact precluded the district court's grant of partial summary judgment against the first and second claims for relief in the complaint. We agree.

Proper notice of a foreclosure sale is mandated by NRS 107.080. The Jamisons and Golden Spike concede that the Bank properly noticed the foreclosure of sale of April 26, 1985, as required by statute. Thereafter, the foreclosure sale was continued by the trustee's public announcement at the time and place of sale—as allowed by the terms of the trust deed, until the property was eventually sold on November 12, 1985. However, the parties agreed, and the Bankruptcy Judge ordered, that there would be no further continuances of the foreclosure sale beyond August 15, 1985, "unless agreed to in writing by Nevada State Bank and the Debtor."

### A. The Complaint's First Claim for Relief.

The first claim for relief in the complaint asserts that the sale of the Golden Spike Casino was not conducted in a commercially reasonable fashion because the Bank failed to properly notice the trustee's sale of November 12, 1985, as required by NRS 107.080. The allegation here is that the Bank was prohibited by the stipulation from continuing the trust deed sale beyond August 15, 1985, by public announcement without an agreement in writing to do so. Logically, then, the Bank would have to renotice the sale pursuant to statute if they could not continue it.

However, the district court granted summary judgment against

this claim reasoning it did not specifically allege that the stipulation and order novated the trustee's right to continue the sale by public announcement. We disagree with the district court's analysis of this issue.

Nevada is a notice-pleading jurisdiction and pleadings should be liberally construed to allow issues that are fairly noticed to the adverse party. *See* NRCP 8(a). *See also* Hay v. Hay, 100 Nev. 196, 198, 678 P.2d 672, 674 (1984). The first claim for relief sets forth, *verbatim,* the relevant portions of the stipulation and order that precluded a continuance of the sale beyond August 15, 1985, without a written agreement between the parties to do so. The cause of action specifically states facts that indicate the stipulation and order modified or terminated the trustee's right to continue the sale by public announcement. This was enough to place the Bank on notice of the allegation that the trustee's sale of the Golden Spike Casino was improperly continued and, therefore, was not conducted in a commercially reasonable fashion. Accordingly, we reverse the district court on this issue.[4]

B.   The Complaint's Second Claim for Relief.

The district court likewise granted summary judgment against the complaint's second claim for relief which alleged a breach of the stipulation and order. Here the court reasoned it was "obvious that the sale was postponed until November 12, 1985, at 4:00 p.m., in order to accommodate plaintiffs and that plaintiffs accepted benefits of the extension and were aware of all extensions." However, this finding is contradicted by D.I. Jamison's affidavit submitted in opposition to the cross-motion for summary judgment.[5]

---

[4]We note, however, that if appellants elect to proceed under their first and second claims for relief, and succeed in an order invalidating the trustee's sale, the Bank may, in the event of a lawful, subsequent trustee's sale, pursue its entitlement, if any, to a deficiency judgment in conformity with NRS 40.455.

[5]The affidavit says in relevant part:

1.   Affiant has been and was the President of the GOLDEN SPIKE CORPORATION, one of the plaintiffs herein, from September 20, 1977, until the corporation's charter was revoked on September 1, 1986; from the date of incorporation to September 20, 1977, Affiant was Secretary of said corporation . . . .

2.   That prior to November 12, 1985, Affiant was never informed by Nevada State Bank, nor any of its employees, agents or representatives, that Nevada State Bank's foreclosure of the Golden Spike Casino was postponed to Tuesday, November 12, 1985, at 4:00 p.m.

3.   That prior to November 12, 1985, Affiant was never informed by

"[The] trial court should not pass upon the credibility of opposing affidavits, unless the evidence tendered by them is too incredible to be accepted by reasonable minds." Short v. Hotel Riviera, Inc., 79 Nev. 84, 103, 378 P.2d 979, 984 (1963), quoting 6 Moore, Federal Practice, 2070. D.I. Jamison's affidavit is not so incredible that it cannot be accepted by reasonable minds and, consequently, it establishes a genuine issue of fact precluding summary judgment. Accordingly, we reverse the district court on this issue as well.

Gregory O. Taylor, Esq., Senior Vice-President and Legal Counsel of Nevada State Bank that Nevada State Bank's foreclosure sale was postponed to Tuesday, November 12, 1985, at 4:00 p.m.

4. On November 12, 1985, after 4:00 p.m., a local Carson City resident informed Affiant that the Golden Spike Casino may have been sold.

5. That Affiant contacted Josephine Leverett, Assistant Vice-President of First Commercial Title, Inc., between 4:30 p.m. and 5:00 p.m. on November 12, 1985, that Ms. Leverett would neither confirm nor deny that the Golden Spike Casino had been sold.

6. That at approximately 5:00 p.m. on November 12, 1985, Affiant informed the Nevada Gaming Control authorities that the Golden Spike Casino may have been sold, but that Affiant could not confirm that fact.

7. That on the morning of November 13, 1985, Affiant contacted Josephine Leverett at First Commercial Title, Inc., who stated that the foreclosure sale of the Golden Spike Casino had taken place on November 12, 1985. Later that morning, Gaming Control agents confirmed to Affiant that the Golden Spike Casino had been sold.